IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK   JUDGE ABRAMS

MATTHEW MOONEY

      Plaintiff,

v.

AXA ADVISORS, LLC, a Delaware Limited liability
Company; AXA NETWORK, LLC, a Delaware
Limited Liability Company;  AXA EQUITABLE LIFE
INSURANCE  COMPANY, a Delaware Corporation;
AXA DISTRIBUTORS, LLC, a Delaware Limited
Liability Company; AXA DISTRIBUTORS
INSURANCE AGENCY, LLC, a Delaware Limited
Liability Company;   AXA DISTRIBUTORS
INSURANCE AGENCY OF MASSACHUSETTS,
LLC, a Massachusetts Limited Liability Company,

      Defendants.

13 CV 3093
No.

Jury Demanded



RECEIVED
MAY 0 8 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff, Matthew Mooney ("Mooney"), by his attorneys, as his Complaint against

Defendants, AXA Advisors, LLC ("AXA Advisors"); AXA Network, LLC ("AXA Network");

AXA Equitable Life Insurance Company ("AXA Equitable"); AXA Distributors, LLC ("AXA

Distributors"); AXA Distributors Insurance Agency, LLC ("AXA Distributors Insurance");

and AXA Distributors Insurance Agency of Massachusetts, LLC ("AXA Distributors

Insurance of Mass.") (Defendants AXA Advisors, AXA Network, AXA Equitable, AXA

Distributors, AXA Distributors Insurance, and AXA Distributors Insurance of Mass. are

referred to collectively, for purpose of this Complaint, as "AXA"), states as follows:

1

## Nature Of The Action

1.      This action challenges under the Sherman Act and New York's Donnelly Act a no-switching agreement between certain Defendants and a third party.  This agreement harms employees, including Plaintiff, by reducing their ability to receive commissions they have earned and provide professional services to their clients, and limits their professional opportunities.      Plaintiff also raises state law claims of defamation and breach of contract related to a trademark license agreement and the termination of Mooney's professional association with certain Defendants and new association with a competing third party in the same industry as AXA.

## Parties

2.      Plaintiff Matthew Mooney is an individual residing in Lyndhurst, Ohio.  For several years prior to the filing of this Complaint, Mooney worked as an agent/representative and associate of AXA.  Mooney has in excess of 19 years of experience in the sale and servicing of insurance products, including life insurance and annuities.  He is licensed to sell insurance in 35 states.

3.      Defendants AXA Advisors and AXA Network are Delaware limited liability companies with their principal places of business in New York, New York.   AXA Advisors provides insurance and annuity products to clients throughout the United States.   AXA Network provides life insurance and annuity products to customers throughout the United States.

4.      Defendant AXA Equitable is a Delaware corporation with its principal place of business in New York, New York providing life insurance and annuity products to

2

consumers throughout the United States.

5.      Defendants AXA Distributors and AXA Distributors Insurance Agency are Delaware limited liability companies, with principal places of business in New York, New York, which provide life insurance and annuity products throughout the United States. On information and belief, AXA Distributors Insurance Agency is a subsidiary of AXA Distributors.

6.      AXA Distributors Insurance of Mass. is a Massachusetts limited liability company, with its principal place of business in New York, New York, providing life insurance annuity products.  On information and belief, AXA Distributors Insurance of Mass. is a subsidiary of AXA Distributors.

**Jurisdiction and Venue**

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331 since Count I alleges a cause of action arising under a United States statute, 15 U.S.C § 1, *et seq.* (the Sherman Act).  In addition, jurisdiction is proper pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this district as Defendants reside in this District and a substantial part of the events giving rise to the claims at issue occurred in this District. Further, the parties contractually agreed to venue in this District regarding that portion of Mooney's claims relating to the Trademark License Agreement alleged herein between Mooney and AXA.

3

## Allegations Common to All Counts

9.    During the period June, 1994 through approximately June, 2002 and from June, 2003 through May 4, 2012 ("Mooney's AXA Service Period"), Mooney provided services as an Associate to AXA or its predecessors.  A copy of Mooney's last operative written Agreement with AXA Network, executed by the parties on June 6, 2003, is attached hereto as Exhibit 1 and incorporated herein.  A copy of Mooney's last operative written Agreement with AXA Advisors, executed by the parties on June 6, 2003, is attached hereto as Exhibit 2, and incorporated herein.

10.    For purposes of his right to vested commissions, seniority, and other benefits, Mooney was credited by AXA as having had eighteen (18) years of continuous service with AXA, and being 100% vested, as of the termination of his employment with AXA on May 4, 2012.

11.    On or about September, 2006, Mooney entered into an agreement with AXA Equitable and AXA Advisors wherein Mooney licensed to AXA a trademark he owned and had registered, "SARP," in connection with the marketing of annuity and life insurance products.  A copy of the license agreement ("Trademark License Agreement") is attached hereto as Exhibit 3, and incorporated herein.  "SARP" stands for Sales Associate Retirement Program, a retirement plan designed for independent contractors such as sales professionals, who otherwise may not have access to traditional retirement planning through their employer.  The SARP program had been created by Mooney, and promoted by AXA since 1998.

12.    In consideration for Mooney's execution of the Trademark License

4

Agreement, AXA Advisors agreed to pay Mooney an amount equal to 1.35% of the value of assets under management on annuity contracts Mooney sold as a registered representative of AXA under the SARP program. This benefit was initially deferred, which resulted in Mooney not receiving commissions on sales of annuity products for the first several years of the SARP program. Mooney reasonably anticipated larger commissions in the long term. Such commissions in the several years prior to the termination of his association with AXA resulted in SARP compensation paid to Mooney in excess of $47,000.00 per year.

13. As further consideration to Mooney for his execution of the Trademark License Agreement, AXA Advisors agreed to promote commission-sharing agreements with other AXA professionals who utilized the SARP trademark in marketing annuity and life insurance products, pursuant to which Mooney would be entitled to one-quarter of the 3.25% commissions earned by such agents on such sales. AXA specifically approved and facilitated each such commission sharing agreement, actively promoted such revenue sharing and structure within AXA, and historically made payments to Mooney in the course of his employment based thereon. Mooney also received an additional percentage of his production for a total commission of approximately 5%.

14. AXA promoted the SARP program and such commission structure to its agents and employees including, but not limited to, on its intranet site, "eDOX." Moreover, AXA sponsored seminars for AXA representatives, associates and agents wherein it encouraged them to market AXA annuity and life insurance products using the SARP program.

5

15.     Pursuant to the Trademark License Agreement, from September 1, 2006 and continuing through at least May 4, 2012, AXA and its agents, representatives and associates, including but not limited to Mooney, marketed AXA annuity products to consumers and professional groups using the SARP trademark licensed to AXA.

16.     During Mooney's AXA Service Period, Mooney personally sold annuities and insurance products for which he was entitled to receive commissions and other amounts as long as AXA received premiums and/or other monies as a result of such sales.

17.     From 1998 and continuing through at least May 4, 2012 and possibly thereafter, AXA continued to receive deposits, and/or other revenue through annuity and life insurance products marketed and sold using the SARP Program.

18.     From 1994 and continuing through at least May 4, 2012 and possibly thereafter, AXA continued to receive premiums and other revenue for annuities and other non-SARP products marketed through Mooney.

19.     Mooney's association with AXA ended on May 4, 2012.

20.     Mooney fully performed pursuant to each of the above referenced agreements and affiliations with AXA through May 4, 2012.

21.     During the course of his association, AXA regularly paid Mooney commissions, service fees and other compensation to which he was entitled per the above Agreements, Mooney's sales efforts and the SARP program.

22.     Subsequent to AXA's acceptance of Mooney's resignation, AXA stopped paying any vested commissions and failed to pay shared commissions and other

6

amounts due and owing to Mooney, notwithstanding AXA's continued receipt of premiums and revenue derived through Mooney's efforts, client development and his intellectual property licensed by AXA through the SARP program.

### COUNT I – TREBLE DAMAGES UNDER THE SHERMAN ACT (15 U.S.C. § 15)

1.     Plaintiff re-alleges paragraphs 1-22 of the general allegations as corresponding paragraphs of Count I and incorporates each herein.

2.     Mooney's agreements with AXA (Exs. 1-2) did not include any restrictive employment covenants.  Specifically, Mooney's agreements with AXA did not preclude him from providing services for, being employed by, or being an agent, representative or advisor of any non-AXA entity, in the event of a termination of any of his affiliations with AXA.

3.     After resigning from AXA, Mooney became affiliated with the Leaders Group, Inc. ("Leaders"), a non-AXA securities broker-dealer based in Colorado with agents/representatives throughout the United States. Leaders and AXA compete with each other in selling AXA annuities and insurance products, and in the market for employees/ associates/ representatives/ agents for such services and products.  AXA associates and representatives market AXA products; Leaders agents/representatives also sell AXA products, as well as similar products from other firms.

4.     Subsequent to terminating his affiliation with AXA and his becoming affiliated with Leaders, Mooney was ready and willing to serve his existing clients (developed in the course of his affiliation with AXA) who had life insurance and annuity contracts in accounts with AXA.  Mooney was similarly ready and willing to service new

7

clients, including through the sale of AXA products.

5.     Unbeknownst to Mooney at the time he resigned from AXA, Leaders and certain AXA Defendants were parties to a Brokerage General Agent/Broker Dealer Agreement ("AXA/Leaders Agreement").   On information and belief, the AXA/Leaders Agreement was drafted solely by AXA, and made a condition to Leaders being able to market AXA products.  A copy of the AXA/Leaders Agreement executed on March 13, 2008 is attached hereto as Exhibit 4, and incorporated herein.

6.     Pursuant to the AXA/Leaders Agreement, AXA required that in the absence of AXA's prior written authorization, Leaders was prevented from appointing as an agent and/or advisor anyone who was previously associated with AXA for twelve months after the termination of their affiliation with AXA.  (AXA/Leader Agreement ¶ 3(c)).  Thus, due to the AXA/Leaders Agreement, Mooney could not sell or service AXA products through Leaders without AXA's written consent.   Further, based upon the prohibition in the AXA/Leaders agreement, AXA would not pay amounts due and owing to Mooney on his clients' AXA accounts.

7.     AXA specifically requested that Mooney seek an exception to the restriction in paragraph 3(c) of the AXA/Leaders Agreement.   When Mooney then requested such an exception, AXA refused to waive the restriction in the AXA/Leaders Agreement, and thereby precluded Mooney in substantial part from serving his clients and receiving amounts due and owing from AXA, and/or selling additional AXA products through Leaders.

8.     Leaders was otherwise ready, willing and able to appoint Mooney as an

8

agent/representative for AXA products, but was unable to do so as a result of AXA's refusal to waive the restriction in the AXA/Leaders Agreement.

9.    The AXA/Leaders Agreement and its preclusion affect interstate commerce, the sale of insurance and annuities between the states, and the market for agents/representatives within and among the states.

10.    The restrictive covenant contained in the AXA/Leaders Agreement constitutes an unreasonable restraint of trade and commerce pursuant to the Sherman Act, 15 U.S.C. § 1, *et seq.*, unrelated to any legitimate interest of AXA. It unreasonably precludes qualified former AXA agents and advisors, including but not limited to Mooney, from providing products to their existing clients, and from receiving monies earned for the generation of such clients, sales and business. It also unreasonably obstructs the market for qualified agents/representatives.

11.    As a consequence of AXA's refusal to waive its unreasonable restraint of trade and competition, AXA Network and AXA Advisors have refused to pay amounts due and owing to Mooney subsequent to May 4, 2012, and Mooney has thereby been injured in his business or property in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff Matthew Mooney respectfully requests that this Court enter an Order granting judgment for Mooney and against Defendants AXA Distributors, LLC; AXA Distributors Insurance Agency, LLC; AXA Distributors Insurance Agency of Massachusetts, LLC; AXA Network, LLC; AXA Advisors, LLC; and AXA Equitable Life Insurance Company, awarding Mooney compensatory damages in excess of

9

$75,000.00, trebled damages, costs, attorney's fees and granting all other relief deemed just and appropriate.

## COUNT II – TREBLE DAMAGES UNDER THE DONNELLY ACT

1.      Plaintiff re-alleges paragraphs 1-8 of Count I as corresponding paragraphs of Count II and incorporates each herein.

2.      The AXA/Leaders Agreement and its preclusion affect intrastate commerce and the sale of insurance and annuity products from and within New York.

3.      The restrictive covenant contained in the AXA/Leaders Agreement constitutes an unreasonable trade practice pursuant to the Donnelly Act, N.Y. Gen. Bus. § 340, unrelated to any legitimate interest of AXA.  It also unreasonably precludes qualified former AXA agents and advisors, including but not limited to Mooney, from receiving monies earned for the generation of such clients, sales and business, and from providing insurance and annuity products to their existing and new clients, unrelated to any legitimate business relationship of AXA.  It also unreasonably obstructs the market for qualified agents/representatives.

4.      As a consequence of AXA's refusal to waive its unreasonable restraint of trade and competition, AXA Network and AXA Advisors have refused to pay amounts due and owing, and Mooney has thereby been damaged in excess of $75,000.00.

WHEREFORE, Plaintiff Matthew Mooney respectfully requests that this Court enter an Order granting judgment for Mooney and against Defendants AXA Distributors, LLC; AXA Distributors Insurance Agency, LLC; AXA Distributors Insurance Agency of Massachusetts, LLC; AXA Network, LLC; AXA Advisors, LLC; and AXA Equitable Life

384206.5

Insurance Company, awarding Mooney compensatory damages in excess of $75,000.00, trebled damages, costs, attorney's fees, and granting all other relief deemed just and appropriate.

## COUNT III – DEFAMATION *PER SE*

1.       Plaintiff re-alleges paragraphs 1-22 of the general allegations as corresponding paragraphs of Count III and incorporates each herein.

2.       Subsequent to Mooney's resignation from AXA, AXA undertook efforts to disparage and discredit Mooney in the eyes of his existing clients so as to injure Mooney's reputation, interfere with his client relationships, and to wrongfully discourage such clients from continuing their professional business relationships with Mooney.

3.       Upon learning of Mooney's intended resignation from AXA, William Degnan, then-President of AXA's American Division, on or about April 20, 2012 told Mooney that his resignation would be "accepted," but that Mooney would "feel pain" as a consequence.

4.       Thereafter, in furtherance of its plan to disparage Mooney and make him "feel pain," on or about January 17, 2013, AXA, through its agents, including but not limited to, Justin Scheeff and Greg Emmons, contacted and met personally with Mooney's client, Molly Schmittgen, and told her that Mooney "only knew about life insurance," "didn't know anything about investments," "hated helping clients with investing their money" and "invested her in all of the wrong accounts because he didn't know what he was doing."

5.       Scheeff and Emmons are agents affiliated with the AXA office in

11

Cleveland, Ohio, the same office in which Mooney worked. Scheeff knows Mooney personally because Mooney helped to train Scheeff. On occasion, Mooney gave Scheeff direction, including with respect to annuity services and products.

6. AXA's agents published their defamatory statements of and concerning Mooney on behalf of their principal, AXA, in furtherance of AXA's business. On information and belief, other AXA agents and representatives have contacted Mooney's clients and made similar disparaging comments of and concerning Mooney.

7. Said statements of and concerning Mooney made by AXA's agents on its behalf are all false, in that:

a. Mooney is knowledgeable about investments other than life insurance;

b. Mooney has successfully sold products other than life insurance for AXA for more than 19 years;

c. At AXA, approximately 85-90% of Mooney's business was the sale of annuity products, and only 10-15% was life insurance products;

d. Mooney regularly advises and assists his clients in investing their money; and

e. Ms. Schmittgen's investments are in accounts that are appropriate for her level of wealth and her investment goals, as a result, in part, of the advice and counsel of Mooney.

8. The above statements were defamatory *per se* because they accused Mooney of lack of ability and/or ethics in his profession, and tended to injure him in his profession.

12

9.    Defendants published their statements of and concerning Mooney negligently, in that the agents making the statements knew or should have known that 1) Mooney is, and was, knowledgeable about products other than life insurance; 2) that Mooney is licensed to sell non-insurance products and has successfully done so for more than 19 years; and because a review of her policies would have revealed that Ms. Schmittgen's investments were appropriate for her wealth and investment goals.

10.    In the alternative, Defendants published their statements of and concerning Mooney with knowledge of their falsity or in reckless disregard for the truth. AXA and Scheeff knew that Mooney sold far more annuity products than life insurance products, and that he was well-qualified to market, sell and counsel clients regarding such products.    AXA, through its agents Scheeff and Emmons, fabricated the statements disparaging Mooney's professional abilities to make him "feel pain," to hinder Mooney's business, and to advance its own business.

11.    In addition, Defendants published their statements of and concerning Mooney with ill will, spite, and intent to cause injury to Mooney.

12.    As a consequence of AXA's statements, Mooney's reputation was injured.

WHEREFORE, Plaintiff Matthew Mooney respectfully requests that this Court enter an Order granting judgment for Mooney and against Defendants AXA Advisors, LLC; AXA Network, LLC; and AXA Equitable Life Insurance Company, and award compensatory damages in excess of $75,000.00, punitive damages to be determined at trial, costs and all other relief deemed just and appropriate.

13

## COUNT IV – BREACH OF CONTRACT – AXA NETWORK, LLC

1.     Mooney re-alleges paragraphs 1-22 of the general allegations as corresponding paragraphs of Count IV and incorporates each herein.

2.     Mooney's associate agreement with AXA Network (Ex. 1) provided that he would be paid commissions, service fees and additional compensation on premiums and other considerations for insurance policies and annuity contracts as set forth in the Agreement.

3.     Pursuant to the agreement, renewal commissions for premiums for insurance policies and compensation for annuity contracts secured by Mooney while an AXA associate vested upon completion of twelve (12) years of continuous service with AXA Network.

4.     Mooney was credited by AXA as having had eighteen (18) years of continuous service with AXA Network as of the termination of his employment with AXA on May 4, 2012, and being 100% vested.  Accordingly, he was entitled to vested renewal commissions, compensation, and service fees as long as AXA received premiums and other revenue on insurance policies, annuities and other products secured by and/or through Mooney.

5.     AXA continues to receive premiums and other revenue for products sold by or through Mooney, but has failed to remit any such vested commissions and service fees to Mooney subsequent to May 4, 2012.

6.     As a result of AXA Network's breach of contract, Mooney has been damaged in excess of $75,000.00.

14

WHEREFORE, Plaintiff Matthew Mooney respectfully requests that this Court enter an Order granting judgment for Mooney and against Defendant AXA Network, LLC, awarding Mooney compensatory damages against Defendant in excess of $75,000.00, in addition to costs, and granting all other relief deemed just and appropriate.

## COUNT V – BREACH OF CONTRACT – AXA ADVISORS

1.      Mooney re-alleges paragraphs 1-22 of the general allegations as corresponding paragraphs of Count V and incorporates each herein.

2.      Pursuant to his agreement with AXA Advisors, Mooney was to receive commissions and service fees in consideration for his marketing annuities and other products on behalf of AXA.

3.      AXA continues to receive funds for products secured by Mooney, but has failed to remit any such vested commissions or service fees to Mooney subsequent to May 4, 2012.

4.      On information and belief AXA continues to receive monies from customers and groups which purchased products through the SARP program, but has failed to remit to Mooney any commissions and service fees earned on his sale of products through AXA Advisors and through the SARP program.

6.      As a consequence of Defendant's wrongful failure to pay compensation owed, Mooney has been damaged in excess of $75,000.00.

WHEREFORE, Plaintiff Matthew Mooney respectfully requests that this Court enter an Order granting judgment for Mooney and against Defendant AXA Advisors,

15

384206.5

LLC, awarding Mooney compensatory damages against AXA in excess of $75,000.00, in addition to costs, and granting all other relief deemed just and appropriate.

## COUNT VI – TRADEMARK COMPENSATION OWED
## (AXA EQUITABLE LIFE INSURANCE COMPANY AND AXA ADVISORS, LLC)

1.      Mooney re-alleges paragraphs 1-22 of the general allegations as corresponding paragraphs of Count VI and incorporates each herein.

2.      As a result of AXA Equitable's and AXA Advisors's failure to remit compensation to Mooney for annuities marketed through the SARP trademark, including those marketed by other AXA personnel, Mooney's counsel wrote to AXA informing AXA of the breach of that agreement.  A copy of such letter is attached hereto as Exhibit 5.

3.      AXA has failed to cure its breach within 30 days after receiving notice of such breach from Mooney.

4.      As a consequence of Defendants' breach, Mooney has lost compensation due to him pursuant to the Trademark License Agreement.

16

WHEREFORE, Plaintiff Matthew Mooney respectfully requests that this Court enter an Order granting judgment for Mooney and against Defendants AXA Equitable Life Insurance Company and AXA Advisors, LLC, awarding Mooney compensatory damages against AXA in excess of $75,000.00 and costs, and granting all other relief deemed just and appropriate.

PLAINTIFF DEMANDS TRIAL BY JURY.

Dated: New York, NY
May 7, 2013

Respectfully submitted,

WECHSLER & COHEN, LLP
James F. X. Hiler (JH 6250)
17 State Street, 15th Floor
New York, NY 10004
Tel. (212) 847-7900
Fax. (212) 847-7955
E-mail: jhiler@wechco.com

and

Phillip J. Zisook
Jerry I. Rudman
Leon E. Farbman
Deutsch, Levy & Engel, Chartered
225 West Washington St. Suite 1700
Chicago, IL 60606
(312) 346-1460

17

# Exhibit 1

### AGREEMENT BETWEEN

AXA NETWORK, LLC, its subsidiaries and AXA Network of Texas, Inc.,
hereinafter collectively called "AXA Network"
and the undersigned, hereinafter called the ASSOCIATE

IT IS MUTUALLY AGREED, that

**I.** Authority. The Associate, when properly licensed, shall canvass on behalf of AXA Network for applications for insurance policies and annuity contracts to be issued by The Equitable Life Assurance Society of the United States (hereinafter "The Equitable"), or any insurance company affiliate thereof as may be provided by agreement between The Equitable and/or AXA Network and such insurance company affiliate, and the Associate shall collect the first premiums and considerations thereon.

Notwithstanding the foregoing, the Associate shall canvass on behalf of AXA Network for such applications only in jurisdictions in which AXA Network is properly licensed to distribute such policies and contracts.

**II.** Territory. The Associate may canvass for applications for insurance policies and annuity contracts and otherwise operate within any jurisdiction and territory where both the Associate and AXA Network are properly licensed to sell such policies and contracts, but is assigned no exclusive rights in any territory.

**III.** Commissions and Service Fees. The Associate shall be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under this Agreement in accordance with the Schedules of Commissions (issued by AXA Network with notice to the Associate) in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. If the Associate held an Equitable agent's agreement immediately prior to entering into this Agreement, the Associate shall continue to be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under such prior agent's agreement in accordance with the applicable schedules of commissions in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. Upon termination of this Agreement, however, service fees and additional compensation, if any, shall no longer be allowed, and renewal commissions shall be allowed only as provided in the Vesting Provisions of Paragraph IV below.

**IV.** Vesting of Commissions. Renewal commissions on premiums for insurance policies and considerations for annuity contracts secured by the Associate under this Agreement, or under any prior agent's agreement between the Associate and The Equitable in effect immediately prior to this Agreement, to the extent allowable under the applicable schedules of commissions in force on the date of the application for the policy or contract, shall become vested on the occurrence of the earliest of the following events:

DOCSNY1:616028.2

**A.** Completion of 12 years of continuous service with AXA Network and/or The Equitable, or 10 years of continuous service with AXA Network and/or The Equitable and the attainment of 120,000 production credits. Any period under agreement as an Associate with, or in the service of, The Equitable or any of its insurance company affiliates, or AXA. Network immediately preceding this Agreement or immediately following the termination of this Agreement shall be deemed part of such service.

**B.** The Associate's 65th birthday, if this Agreement is then in full force and effect, or if immediately following the termination of this Agreement the Associate continues under agreement with or in the service of AXA Network and/or The Equitable or any of their insurance company affiliates until age 65.

**C.** The death of the Associate, if this Agreement is then in full force and effect, or if immediately following the termination of this Agreement the Associate continues under agreement with or in the service of AXA Network and/or The Equitable or any of their insurance company affiliates until death.

If this Agreement shall terminate, a collection charge, as specified in the Schedules of Commissions, shall be deducted from payments of vested renewal commissions, except where such commissions have vested as provided in Sub-paragraphs B or C.

**V.** Assignments. No assignment of this Agreement shall be valid. No assignment of commissions or other payments due or to become due under this Agreement shall be recognized unless written acknowledgment of its receipt and filing is issued by AXA Network.

**VI.** Limitations on Associate's Authority. The Associate shall have no authority with respect to AXA Network and/or The Equitable or any of their insurance company affiliates other than as expressly stated in this Agreement. Without limiting the generality of the foregoing, the Associate shall not:

- make, alter or discharge contracts,
- waive forfeitures,
- grant permits,
- name special rates or guarantee dividends,
- make any endorsements on policies and annuity contracts,
- accept or issue receipts for deferred or renewal premiums or considerations,
- receive any moneys due or to become due except as specified in Paragraph I of this Agreement or as

**EXHIBIT**

specifically authorized in writing by an officer of AXA Network, provided, however, that any existing, written authorizations to receive any moneys due or to become due, specifically issued to the Associate by an officer of The Equitable under any prior agent's agreement between the Associate and The Equitable, shall remain in full force and effect,

* deliver a policy of life insurance or accident and health insurance unless payment of the premium shall have been made during the applicant's good health, or
* bind AXA Network and/or The Equitable or any of their insurance company affiliates in any way.

VII.   Regulations. This Agreement is subject to such rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business.

VIII.   Rejections.   The Equitable and/or any of its insurance company affiliates shall at all times have the right in their sole discretion to reject any applications for their policies of insurance and annuity contracts.

IX.   Reservation of Rights  The rights reserved to AXA Network and/or The Equitable in this Agreement or in any prior agent's agreement between the Associate and The Equitable, including without limitation those contained in Paragraphs X, XI, and XIV, and Subparagraph B of Paragraph XIII, shall survive the termination of this Agreement.

X.   Collections and Return of Property.   All collections made by the Associate hereunder shall be kept in trust entirely separate and distinct from other funds, and shall forthwith be paid over in cash to AXA Network. Any and all property of AXA Network held by the Associate shall be returned to AXA Network at an appointed time, or on demand. All unpaid policies or contracts and all other property of The Equitable or any insurance company affiliate thereof held by the Associate shall be delivered to AXA Network at an appointed time, or on demand.

XI.   Indebtedness.   AXA Network may offset as a first lien against any claim for compensation under this Agreement any debt due or to become due, hereunder or otherwise, from the Associate to AXA Network or any of its affiliates. Debt not fully satisfied by such offset is a personal debt of the Associate recoverable at any time with interest under AXA Network's rules. "Debt" as used herein includes, but is not limited to, paid but unearned commissions attributable to refunded termination values or to premiums wholly or partially unpaid or refunded, loans, and amounts claimed by AXA Network or any of its affiliates under any account with the Associate.

XII.   Bond. The Associate hereby agrees to furnish, on request, a bond of indemnity satisfactory to AXA Network and maintain the same in force, in such an amount and with such sureties as AXA Network may require. Any bond of indemnity furnished to The Equitable or any of its affiliates shall continue to be maintained by the Associate.

XIII.   Termination.

A.   This Agreement shall be terminable forthwith if the Associate shall enter under contract with or into the service of any insurance company other than The Equitable or any insurance company affiliate thereof, or if the Associate shall fail to comply with any of the provisions or conditions of this Agreement, or if the Associate shall violate any law in force in the territory in which the Associate is doing business.

B.   If this Agreement is terminated by reason of violation of Paragraph X or Sub-paragraphs A and B of Paragraph XIV or Paragraph XV, or if after termination of this Agreement the Associate engages in acts or practices proscribed by Paragraph X or Sub-paragraphs A and B of Paragraph XIV, the Associate shall forfeit all commission interest which might otherwise have been acquired under any agreement with AXA Network or under any prior agreement between the Associate and The Equitable.

C.   This Agreement shall be terminable by AXA Network upon 30 days prior written notice to the Associate where the Associate in the sole discretion of the Branch Manager has failed to achieve applicable production standards.

D.   Unless otherwise terminated, this Agreement may be terminated by either party with or without cause, by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination.

XIV.   Unauthorized Practices.

A.   Twisting.   The Associate shall not at any time induce or endeavor to induce policyowners of The Equitable or any insurance company affiliates thereof to relinquish their policies or contracts.

B.   Proselyting.   The Associate shall not at any time induce or endeavor to induce associates of AXA Network to terminate their relationship with AXA Network in order to become sales representatives or sales managers with another insurance company, agency, or broker.

C.   Rebates.   The Associate shall under no circumstances pay or allow, or offer to pay or allow, any rebate of premium or consideration in any manner whatsoever, directly or indirectly.

XV.   Adverse Activity.  The Associate shall not violate any law in force in any territory in which the Associate is doing business. Additionally, the Associate shall not engage or become involved in any activity or other conduct or association, whether or not lawful, which affects or tends to affect adversely the reputation of AXA Network and/or The

Equitable, or their affiliates, or of any their associates or employees generally or specifically in their community, or which casts odium on them or on the officers or directors of AXA Network and/or The Equitable, or their affiliates or which might otherwise be detrimental to the business of AXA Network and/or The Equitable or their affiliates.

XVI.  Associate Benefit Program.  The Associate may participate in the Associate Benefit Program as now or hereafter provided by AXA Network to the extent for which such Associate is qualified.  The Associate shall not be eligible for workers' compensation benefits.

XVII.  Independent Contractor.  Nothing contained herein shall be construed to create the relationship of employer and employee between AXA Network or The Equitable and the Associate. The Associate shall be free to exercise independent judgment as to the persons from whom applications for policies and annuity contracts will be solicited and the time and place of solicitation.

The Associate shall abide by the rules and regulations of AXA Network in accordance with Paragraph VII hereof but such rules and regulations shall not be construed so as to interfere with the freedom of action of the Associate as described in this Paragraph.

XVIII.  Violations.  Without prejudice to AXA Network's right of termination under Paragraph XIII hereof, AXA Network shall have the right, if the Associate shall violate any of the terms of this Agreement, to suspend and withhold payment of any commission or service fee otherwise payable hereunder or under any prior agreement between the Associate and The Equitable, until satisfied that such violation has ceased or been cured.

XIX.  AXA Network's Prior Right.  While this contract is in effect, the Associate shall not, and shall not agree to, solicit, obtain or submit any application to any company other than The Equitable or any insurance company affiliate thereof, for any insurance policy or annuity contract, nor shall the Associate in any other way assist in obtaining or providing any such insurance or annuity from any such other company, unless specifically authorized in writing by AXA Network, provided, however, that any existing, written authorizations issued by an officer of The Equitable shall remain in full force and effect.

XX.  Sole Agreement.  This Agreement is intended to be the entire and final understanding of the parties hereto, with respect to the Associate's authority as specified in Paragraph I of this Agreement, and shall supersede all prior agreements if any, of the parties hereto with respect to such Associate's authority only.  In addition, as of the date on which AXA Network becomes properly licensed in a particular jurisdiction to distribute insurance policies and annuity contracts of The Equitable or any of its insurance company affiliates, this Agreement shall supersede any agent's agreement between the Associate and The Equitable, to the extent then in effect, for the sale of such policies and contracts in that particular

jurisdiction. This Agreement may not be modified other than by a writing approved by an officer of AXA Network. It is understood, however, that all existing obligations to AXA Network and/or The Equitable heretofore incurred or assumed by the Associate, and existing liens created in connection therewith, shall continue to exist, and the Associate's rights under any prior contracts and agreements, with AXA Network and/or The Equitable are not impaired, provided, however, that any rights under any prior agent's agreement between the Associate and The Equitable and/or AXA Network shall not be in addition to any rights accorded the Associate under this Agreement.

XXI.  Effective Date.  This Agreement shall take effect in any jurisdiction where the Associate is properly licensed to sell insurance policies and annuity contracts of The Equitable or any of its insurance company affiliates, as of the later of (a) January 1, 2000, (b) the date on which AXA Network becomes properly licensed to distribute such policies and contracts in that particular jurisdiction or (c) the date this Agreement is duly signed by the Associate and countersigned by an authorized representative of AXA Network.

IN WITNESS WHEREOF, the parties to this Agreement have subscribed their names this _6TH_ day of _JUNE_, _2003_.

EXECUTED IN DUPLICATE

_____
ASSOCIATE

_12674  COOPERS RUN  STRONGsville OH 444;_
STREET ADDRESS

_STRONGSVILLE (CUYAHOGA)  OHIO_
CITY (COUNTY) STATE

AXA NETWORK, LLC
for itself and its subsidiaries and as
agent of AXA Network of Texas, Inc.

By: _____
AUTHORIZED REPRESENTATIVE

(219-1405-91-8)
14A Edition

## Addendum for AXA Network 12th and 14th Edition Agreements

This Addendum supplements the Associate's Agreement with AXA Network, LLC, and its successors and assignees as follows:

(1)   The following language shall be added after the second paragraph of the first paragraph of Paragraph I of the Associate's Agreement:

"Notwithstanding the foregoing, the Associate is not authorized to canvass for any business in the State of Mississippi or to any resident of the State of Mississippi, except for (1) term life insurance and fixed annuity products for existing Equitable policyholders and/or contract owners, and (2) changes or additions permitted pursuant to the terms of existing policies, contracts and/or tax sheltered annuity/401(k) plans with Insurers. Any such sales must be approved in accordance with the policies and procedures established by AXA Network for sales in Mississippi or to Mississippi residents."

(2)   The following language shall be added after the first sentence of Paragraph II of the Associate's Agreement:

"Notwithstanding the foregoing, in the State of Mississippi or to any resident of the State of Mississippi the Associate's authority shall be subject to the limitations specified in Paragraph I of this Agreement."

The Associate's Agreement and this Addendum are the whole agreement of the parties concerning the subject herein and shall be modified or changed only by written amendment executed by the parties, except in the event that the modification(s) specified in this Addendum are deleted. In such case, AXA Network shall provide written notice to the Associate that the modification(s) specified herein are no longer in effect.

Associate:                                         AXA Network, LLC:

By: _____

Name: _MATThew A-MorNEy_        By: _____
(Please Print)                                        John M. Lefferts, CFP, CLU, ChFC

Date: _6-6-03_

AXA Network Addendum MS-12th & 14th Editions

# Exhibit 2

AGREEMENT BETWEEN AXA ADVISORS, LLC
hereinafter called AXA Advisors, and the undersigned registered representative of AXA Advisors,
hereinafter called the Representative

It is mutually agreed, that:

I. Authority. The Representative, when authorized by AXA Advisors to do so with respect to each product or service offered or distributed by AXA Advisors, may solicit customers or clients for such products and services on AXA Advisors' behalf. The Representative may also perform other functions with respect to such products or services, when authorized by AXA Advisors to do so.

All authority granted under this Agreement is contingent upon the Representative's obtaining and keeping in force such permits or licenses as may be required by all Federal, state, or local governmental authorities or by other regulatory authorities, with respect to each activity engaged in by the Representative, and such authority with respect to each activity shall automatically terminate in the event that any required permit or license is suspended, revoked, or otherwise lapses.

Notwithstanding any advice or assistance that may be offered or given to the Representative by AXA Advisors, including the payment of license or registration fees, it shall be the Representative's sole responsibility to obtain and keep in force all required permits or licenses.

II. Territory. Unless otherwise specified by AXA Advisors with respect to a particular product or service, the Representative's authority to represent AXA Advisors, granted pursuant to Section I, extends to any territory in which the Representative is properly licensed and in which AXA Advisors has approved the offering or distribution of such product or service.

III. Commissions and Service Fees. The Representative shall be paid such commissions, service fees and other compensation as may be provided for by schedules and rules published from time to time by or on behalf of AXA Advisors. Such rules may include provisions governing the timing of payment, the recovery of commissions for business that does not persist, and all other aspects of the Representative's entitlement to compensation. Unless expressly provided by such rules, there will be no vesting of renewal commissions or other continuing compensation, if any such renewal commission or other continuing compensation is payable with respect to any products or services offered through the Representative under this Agreement. Any compensation due and payable by AXA Advisors hereunder may be paid by AXA Network, LLC ("AXA Network") or such other paymaster as AXA Advisors may designate from time to time.

IV. Assignments. No assignment of this Agreement by the Representative shall be valid. No assignment of commissions, service fees, or other compensation or payments due or to become due under this Agreement shall be recognized unless written acknowledgment of its receipt and filing is issued by or on behalf of AXA Advisors. No assignment of compensation or payments due or to become due shall be valid to the extent it violates any law, regulation or AXA Advisors policy pertaining to the entitlement or to the underlying transaction giving rise to the entitlement or the commission, service fee or other compensation or payments.

V. AXA Advisors Rules and Regulations. This Agreement is subject to, and the Representative shall adhere to, all rules, regulations, policy guidelines or other instructions that AXA Advisors (or another entity acting on its behalf) may from time to time publish (including any item that has been published in the name of Equico Securities, Inc. or EQ Financial, by which AXA Advisors was formerly known) in the form of compliance guides or manuals,

DOCSNY1:645563.1

informational bulletins, notices or other written communications. These rules, regulations, policy guidelines or instructions may place limitations on the authority of the Representative to act on AXA Advisors' behalf with respect to products and services offered or distributed by AXA Advisors.

VI. Reservation of Rights. The rights reserved to AXA Advisors in this Agreement, including, without limitation, those contained in Sections VII, VIII and XI, shall survive the termination of this Agreement.

VII. Collection and Return of Property. Any client funds received by the Representative arising out of the activities performed hereunder shall be kept entirely separate and distinct from other funds, and the Representative shall forthwith pay over the same to AXA Advisors or to such other party as AXA Advisors may designate. All property of AXA Advisors entrusted to the Representative including, but not limited to, price lists, customer and client lists, copies of files and records required by any regulatory authority to be maintained under applicable recordkeeping rules, training and sales literature and other material, shall be used by the Representative only for activities on behalf of AXA Advisors, and all such materials shall be returned to AXA Advisors on demand.

VIII. Indebtedness. AXA Advisors may offset against any claim for compensation arising under this Agreement, any debt now due or to become due at any time form the Representative to AXA Advisors or any of its subsidiaries or affiliates, whether arising hereunder or otherwise. Any such debt shall be a first lien against any such claim and shall survive the termination of this Agreement and, to the extent remaining after offset, shall be a personal debt of the Representative.

IX. Bond. The Representative hereby agrees to furnish, on request, a bond of indemnity satisfactory to AXA Advisors and maintain the same in force, in such an amount and with such sureties as AXA Advisors may require.

X. Terminations and Suspensions.

A. This Agreement shall be terminable forthwith if the Representative shall fail to comply with any of the provisions or conditions of this Agreement, or if the Representative shall violate any law or regulation in force in any territory in which the Representative is doing business. This Agreement, and the authority conferred herein, may be suspended in the event the Representative is arrested, charged, or investigated by any Federal, state, or local government authority or other regulatory authority, or in the event AXA Advisors or any of its subsidiaries or affiliates have reasonable grounds to investigate information or allegations indicating that the Representative may have violated any published rule, regulation, or policy guideline of AXA Advisors or any of its subsidiaries or affiliates, or any law or regulation of any relevant jurisdiction. Such suspension may remain in effect until the final resolution of the subject matter of the arrest, charge or investigation.

B. Unless otherwise terminated, this Agreement may be terminated by either party by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination.

C. In the event that the Representative's Associate's Agreement with AXA Network terminates, this Agreement shall automatically terminate as of the same date.



EXHIBIT
2

**Addendum for AXA Advisors**
Registered Representatives on 12<sup>ths</sup> and 14<sup>ths</sup>

This Addendum supplements Registered Representative Agreement with AXA Advisors, LLC, and its successors and assignees ("Registered Representative Agreement") as follows:

(1)   The following language shall be added after the second sentence of the first paragraph of Paragraph I of the Registered Representative Agreement:

"Notwithstanding the foregoing, in the State of Mississippi or to any resident of the State of Mississippi, the Associate is authorized to offer only mutual funds to existing clients and changes or additions permitted pursuant to the terms of existing variable policies, contracts and/or tax-sheltered annuity/401(k) plans. Any such sales must be approved in accordance with the policies and procedures established by AXA Advisors for such sales in Mississippi or to Mississippi residents."

(2)   The following language shall be added after the first sentence of Paragraph II of the Registered Representative Agreement:

"Notwithstanding the foregoing, in the State of Mississippi or to any resident of the State of Mississippi, the Representative's authority shall be subject to the limitations specified in Paragraph I of this Agreement."

The Registered Representative Agreement and this Addendum are the whole agreement of the parties concerning the subject herein and shall be modified or changed only by written amendment executed by the parties, except in the event that the modification(s) specified in this Addendum are deleted. In such case, AXA Advisors shall provide written notice to the Representative that the modification(s) specified herein are no longer in effect.

Registered Representative:                 AXA Advisors, LLC:

By: _____         By: _____

Name: _Matthew A. Mooney_
(Please Print)                                     John M. Lefferts, CFP, CLU, ChFC
                                                        President

Date: ____6 - 6 - 03____

AXA Advisors Addendum MS-12th and 14th

# Exhibit 3

uu/8/ccuu/ `iu.4u  rnx                    AAA/CLIENT  SOLUTIONS/RDG                          p.2
                                                                                               002/004

## Trademark License Agreement

AGREEMENT made this1st day of September, 2006 by and among Matthew A. Mooney, residing at 12674 Coopers Run, Strongsville, Ohio ("Licensor") and AXA Equitable Life Insurance Company and AXA Advisors, LLC (collectively, "Licensee") having its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

**1. Purpose.** Licensor is the owner of the trademark SARP for financial services in connection with the administering a retirement savings account (the "Mark") and of Registration No. 2,927,059 for the Mark in the United States Patent and Trademark Office. Licensee desires to acquire and Licensor is willing to grant to Licensee a license to use the Mark for the marketing of annuities and financial services products (the "Licensed Products/Services") on the terms and conditions herein.

**2. Grant of Rights.** Licensor hereby grants to Licensee, subject to the following terms and conditions, a nonexclusive license (the "License") to use the Mark within the United States in connection with the Licensed Products/Services. Licensee agrees that Licensor is the owner of all right, title and interest in and to the Mark, including without limitation trademark Registration No. 2,927,059, and that Licensee's use of the Mark creates in Licensee no rights in said mark other than as set forth herein. Licensor acknowledges receipt of satisfactory compensation in consideration of and full payment for the License.

**3. Term.** This Agreement shall commence on the date of its execution by the parties hereto and shall continue until terminated pursuant to the provisions herein.

**4. Enforcement.** To the extent a party is aware of the following, each party agrees to inform the other promptly in writing of (a) any infringement or misuse of the Mark, (b) any challenge to Licensee's use of the Mark, and (c) any claim by any person to any right in the Mark. Licensor and Licensee shall agree on the course of action and cooperate h respect to the foregoing.

**5. Indemnification.** Licensor agrees to indemnify Licensee and hold it, its affiliated companies and its and their officers, directors, employees and agents harmless against all actions, loss, liability, claims, costs, damages or expenses which may be brought against or made against or incurred by Licensee as a result of or in any way connected with any claim that the Licensee's use of the Mark infringes any other trademark, trade name, service mark, or any other proprietary right of a third party.

**6. Termination.** This Agreement and all rights granted herein shall terminate upon written notice from Licensor to Licensee in the event that Licensee breaches any of the provisions of this Agreement and fails to cure such breach within thirty (30) days after receiving written notice of such breach from Licensor.

**7. General.** Neither party shall have the right to assign this Agreement without the consent of the other party except that Licensee shall have the right to assign or transfer this Agreement and the License without the prior written consent of Licensor to any affiliate of Licensee. No change, amendment or modification of any provision of this Agreement shall be valid unless set forth in a written instrument signed by both parties. Any failure by either party to enforce any provision of this Agreement shall not constitute a waiver of such party's rights therein. This Agreement shall be governed by and construed under the laws of the State of New York and the applicable laws of the United States without regard to conflicts of laws. The exclusive forum for any actions arising out of or relating to this Agreement shall

**EXHIBIT**

3

tabbies

be the appropriate state or federal court sitting in the County of New York, State of New York. Any notice, communication, approval or disapproval and request therefor required or permitted to be sent under this Agreement shall be duly made and shall be valid and effective only if in writing and sent by registered or certified mail, return receipt requested, postage prepaid to Licensor at the address set forth above, attention: Matthew A. Mahoney and if to Licensee at the address set forth above, attention: Ronald Lombardi. This Agreement is the entire agreement of the parties with respect to its subject matter and is binding upon the parties, their successors and assigns.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

| *Matthew A. Mooney* | AXA Equitable Life Insurance | AXA Advisors, LLC |
|---|---|---|
| Licensor | Company | |
| Licensor: *Matthew A. Mooney* | By: | By: |
| Name: *Matthew A. Mooney* | Name: *Robert S. Jones Jr.* | Name: *Robert S. Jones Jr.* |
| Title: *Registered Representative* | Title: *EVP* | Title: *Chairman* |

2

05/07/2007 18:48 FAX                    AXA/CLIENT SOLUTIONS/RDG                    p.4
                                                                                  ☎004/004



Matthew_Mooney               To: Ronald.Lombardi@axa-equitable.com
<matthew.mooney@ax           cc:
a-advisors.com>              Subject: Re: Trademark license

10/19/2006 11:30 AM

Dear Ron,

I hope this communication finds you well. The purpose of this email is to confirm with AXA
that I, Matthew A. Mooney, the owner of the trademark SARP, give them permission and have
given them permission to use the trademark as a marketing effort in the AXA system.

Matthew A. Mooney

Ronald.Lombardi@axa-equitable.com wrote:

> Matthew,
>
> We need this to be signed to do any other pieces.
> Call me.
>
> Thanks.
>
>
>
>
>
> --
> Matthew A. Mooney
> AXA Advisors
> Registered Representative
> Office: 216-615-7467
> Cell: 216-906-0008
> Fax: 216-861-7607
> www.sarp.myaxa-advisors.com
> 866-350-SARP (7277)
>
>
> Securities offered through AXA Advisors, LLC (NY, NY 212-314-4600),
> Member NASD, SIPC. Annuity and insurance products offered through AXA
> Network, LLC and its subsidiaries. Matthew Mooney is licensed to sell
> insurance and annuities in the following states: CA, CO, CT, DE, FL, IN,
> LA, MD, MI, NY, NC, NJ, OH, TX, VA. Matthew Mooney is licensed to sell
> securities in the following states: OH and NJ.



## CERTIFICATE OF REGISTRATION
### PRINCIPAL REGISTER

The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.

The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.

A copy of the Mark and pertinent data from the application are part of this certificate.

**To avoid CANCELLATION of the registration, the owner of the registration must submit a declaration of continued use or excusable non-use between the fifth and sixth years after the registration date.** (See next page for more information.) Assuming such a declaration is properly filed, the registration will remain in force for ten (10) years, unless terminated by an order of the Commissioner for Trademarks or a federal court. (See next page for information on maintenance requirements for successive ten-year periods.)



Director of the United States Patent and Trademark Office

Int. Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

**Reg. No. 2,927,059**

## United States Patent and Trademark Office
Registered Feb. 15, 2005

SERVICE MARK
PRINCIPAL REGISTER

# SARP

MOONEY, MATTHEW A. (UNITED STATES IN-
DIVIDUAL)
12674 COOPERS RUN
STRONGSVILLE, OH 44149

FOR: FINANCIAL SERVICES, NAMELY, ADMIN-
ISTERING A RETIREMENT SAVINGS ACCOUNT,
IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 7-23-1997; IN COMMERCE 7-23-1997.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SN 78-323,570, FILED 11-5-2003.

DAVID TAYLOR, EXAMINING ATTORNEY

# Exhibit 4



**AXA EQUITABLE**

AXA Distributors, LLC
80 Scott Swamp Road
Farmington, CT 06032
http://AXAdistributors.com

August 18, 2009

The Leaders Group, Inc.
Attn: Betty J. Von Tersch
26 W. Dry Creek Circle
Suite 575   Littleton, Co.   80120

Dear Betty,

Enclosed please fine your signed copy of the Brokerage General Agent/Broker Dealer Agreement for Variable Company Products for your record.  Also enclosed is a copy of the most current compensation schedule related to this contract. The BGA number associated with this contract is #813154.

Please accept our apologies for the delay in getting this copy to you.

Please call if you have any questions or concerns.

Sincerely,

Shirley Zukis
Mgr. Contracting & Selling Agreements
AXA Equitable
80 Scott Swamp Road
Farmington, CT 06032
Phone: 860-409-1105
Email: Shirley.zukis@axa-equitable.com

EXHIBIT
4

## BROKERAGE GENERAL AGENT/BROKER DEALER AGREEMENT
## FOR VARIABLE COMPANY PRODUCTS

### 1.  AUTHORIZATION

The Distributor authorizes you to act as a brokerage general agent and a broker dealer for the purpose of distributing the Variable Company Products (as such term and all other terms used herein are defined below) set forth on Schedule 1 attached hereto as the same may be hereafter amended from time to time. Schedule 1 may be amended by the Distributor in its sole discretion by written notice to you to add or delete insurance products or restrict the sale of certain products in particular jurisdictions. You are not authorized to distribute any Traditional Company Products under this Agreement.

### 2.  RELATIONSHIP

(a) You will be an independent contractor with full freedom to determine the time, place and method of performance and agree that neither this Agreement nor any related dealings with the Companies or the Distributor hereafter will create a relationship of employee and employer between you and the Distributor or the Company. The Distributor will recommend you to the Companies for appointment. You will not distribute any Variable Company Products hereunder unless and until you have been appointed by the Companies.

(b) You will, at all times when performing services under this Agreement, be properly licensed to sell variable insurance products under the insurance laws of any state in which you do business and which require such licensing in connection with the services to be provided under this Agreement.

(c)  You will, at all times when performing services under this Agreement, be registered as a securities broker/dealer under the 1934 Act, be a member in good standing of FINRA and be licensed or registered as a securities broker/dealer in the states that require such licensing or registration in connection with the services to be provided under this Agreement.

### 3.  YOUR REPRESENTATIVES

(a) You will be responsible for the training, supervision, control and conduct of your officers, directors, employees, agents and representatives, including your Representatives, in connection with the distribution of Variable Company Products and otherwise providing the services contemplated by this Agreement to assure compliance with all applicable federal and state laws and regulations (including without limitation, insurance laws and securities laws), FINRA requirements (collectively "Applicable Regulations") and the procedures from time to time issued to you by the Distributor relating to the distribution of Variable Company Products hereunder ("Distributor Wholesaling Policies").

(b) To the extent required by law or regulation, all your dealings with Qualified Retailers and Qualified Representatives with respect to Variable Company Products will be conducted on your behalf by individuals who are both licensed insurance agents in the states in which they do business, who have been appointed by the Companies and registered with FINRA as your representatives (your "Representatives"). You will not instruct, direct or permit any of your Representatives to take any action or to fail to take any action which if taken or not taken by you would be a default hereunder.

(c) You may from time to time recommend insurance agents/registered representatives for appointment as Representatives hereunder on forms provided by the Distributor, signed by you and, where applicable, the proposed appointee. The Companies reserve the right to approve, reject or terminate any appointment at any time with or without cause. You will not recommend any

prospective individual to a Company for appointment in a state unless the individual is your registered representative and is licensed in the state. You will not recommend any prospective individual for appointment if you have any reason to doubt that the individual is of good reputation and is competent and qualified to be an agent of the Company. You will not request, unless you have received prior written authorization from the Distributor, that the Company appoint anyone who has been associated with AXA Network, LLC or any Company at any time during the preceding twelve (12) months.

## 4.  DUTIES AND LIMITS OF AUTHORITY

(a) You will not alter, modify, waive or change any of the terms, rates, or conditions of any Company Product.

(b) You will perform all obligations under this Agreement in compliance with all applicable federal, state, and local laws and regulations, including without limitation insurance and securities laws and regulations, FINRA rules and such codes of conduct and other rules and procedures as may be issued by the Distributor or the Companies relating to the services to be provided by you pursuant to this Agreement, all of which shall be deemed to be a part of this Agreement.. Distributor acknowledges and agrees that Qualified Retailers will be solely responsible for complying with Applicable Regulations and the Broker-Dealer and General Agent Sales Agreement between the Qualified Retailers and the Distributor with respect to selling Variable Company Products to Retail Clients, and for supervising the activities of their Qualified Representatives, which includes ensuring that Qualified Representatives have been properly licensed and appointed with the Company to sell Variable Company Products. You understand and acknowledge that you are not a Qualified Retailer by virtue of entering into this Agreement.

(c) You will not solicit and will not permit any of your Representatives to solicit applications for Variable Company Products from, or recommend Variable Company Products to, prospective purchasers or service the Company policies and contracts under this Agreement. You will not contact, solicit purchasers for Variable Company Products from, or provide services to, clients of Qualified Retailers or any other members of the public (collectively "Retail Clients") pursuant to this Agreement.

(d) The Distributor will, on request, provide you with copies of Approved Sales Materials, and you will deliver the same to the Qualified Retailers writing through you. You will not use or distribute any illustration, brochure, sales script, seminar or other types of presentation, advertising, direct mailing or any other sales materials concerning the Company or the Variable Company Products other than Prospectuses and Approved Sales Materials without the prior written approval of the applicable Company or the Distributor. You will not make any oral or written warranties, representations or other statements concerning the Company or the Variable Company Products contrary to or inconsistent with the Prospectuses or the Approved Sales Materials. Distributor represents and warrants that Approved Sales Materials and Prospectuses provided to you comply with applicable insurance and state and federal securities laws, and filing requirements if any, and are, and will be, true and accurate in all material respects and does not, and will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Distributor acknowledges and agrees that you will be using and relying on Approved Sales Materials and Prospectuses without independent investigation or verification thereof.

(e) You will not accept any sums on behalf of the Company other than checks payable to the Company in payment of the first premium signed by the applicant. You will not endorse checks payable to the Company or pay premiums out of your account.

(f) You will not effectuate a surrender or exchange of an insurance policy or contract issued by a Company in order to purchase a Company Product without the prior written consent of the Company issuing the original policy or contract. Except as otherwise provided in the attached compensation schedules, no compensation will be paid on unauthorized surrenders or exchanges.

(g) You will not, without the prior written consent of the Distributor, authorize or knowingly permit a Qualified Retailer to (1) solicit applications for Variable Company Products on or from the premises of a banking, savings, or similar institution ("Bank") or (2) utilize Bank contacts, referrals or lists of customers or employees to solicit applications for Variable Company Products, except through an Insurance Agency which is an affiliate of such Bank.

(h) You will forward all completed applications, checks and supporting materials to the Distributor promptly following receipt thereof. The Company reserves the right to accept or reject any application in its sole discretion.

(i) You will deliver policies issued by the Company to the Qualified Retailer for delivery to purchasers promptly following receipt thereof.

(j) Any action of your officers, directors, principals, employees, agents and representatives taken on your behalf as a brokerage general agent hereunder pursuant to actual or implied authority will be deemed to be an action taken by you hereunder.

(k) You will not use the name of the Distributor or the Company or any trademark, service mark, symbol or trade style of the Distributor or the Company without the express written consent of the Distributor or the Company, as the case may be. The Distributor will not, and will ensure that the Company does not, use your name, trademark, service mark, symbol or trade style without your express written consent.

(l) You will not authorize or permit any Qualified Retailer to take any action which you are not authorized or permitted to take hereunder. You will communicate to all Qualified Retailers all notifications of changes in process, products, requirements and rules, and all compliance related bulletins and information.

(m) You will at all times during the term hereof maintain professional liability insurance in such form and amounts as the Distributor may require issued by an insurer having an A.M. Best's rating of A VIII or better. You will promptly notify the Distributor if your professional liability insurance is suspended or terminated.

(n) You will keep full and accurate books and records of the business you transact pursuant to this Agreement in accordance with the requirements of the SEC, FINRA and any other regulatory agency having jurisdiction over you. You will make all such books and records available for inspection by representatives of the Distributor and the Company at your offices on reasonable demand at any time during normal business hours.

(o) You will cooperate with the Distributor and the Company in any litigation, judicial or regulatory investigation, proceeding or inquiry relating to the solicitation of applications of the Variable Company Products, underwriting and issuance of Variable Company Products, and/or the servicing of the Variable Company Products, and promptly advise the Distributor of any notice or communication you may receive in connection therewith.

(p) You will promptly forward to the Distributor a copy of each complaint filed by or received from a customer or a regulatory agency concerning Variable Company Products issued pursuant to this Agreement or compliance by you, any of your Representatives or any Qualified Retailer with any laws or regulations or FINRA rules relating to Variable Company Products. You will provide such information in your possession with respect to each complaint as the Distributor may reasonably request and cooperate with the Distributor in resolving the same.

(q) You will not sell, or permit any Qualified Retailer to sell, a Company Product to any person if you know or have reason to believe that such sale is being made, in whole or part, for the purpose of resale or to otherwise transfer any of the rights of ownership or benefits under the policy directly or

246295.1                                    3

indirectly to a third party. You will not endorse, promote, encourage or participate in any program to sell Variable Company Products with the intention or expectation of effecting life settlements or otherwise directly or indirectly creating or transferring any rights of ownership or benefits in whole or part to a person who is not related to the insured or does not have a pre-existing insurable interest under state law. You will promptly notify Distributor of any sale or prospective sale of a Company Product if you discover, are notified or have a reasonable basis to suspect that a Company Product is being purchased with the intention or expectation of resale or other direct or indirect transfer of any rights or benefits of the purchaser or any beneficiary thereunder in whole or part.

(r) You will comply with the U.S. Patriot Act and all other customer identification, anti-money laundering, anti-terrorism and similar laws and regulations (collectively, "AML") to the extent applicable, and the Companies and Distributor may rely on you to so comply. You will, on request, provide Distributor with such certificates of compliance as Distributor may reasonably request. You will require all Qualified Retailers to complete required AML training and provide verification of the same to Distributor on request. You will promptly notify Distributor if you detect suspicious customer activity and cooperate with Distributor and the Companies in testing the effectiveness of their AML programs, including testing of the requirements in this section.

(s) You will follow the Principles of Ethical Market Conduct of the Insurance Marketing Standards Association ("IMSA Principles") to (i) conduct business according to high standards of honesty and fairness and to render that service to its customers, (ii) provide competent and customer-focused sales and service, (iii) engage in active and fair competition, (iv) provide advertising and sales materials that are clear as to purpose and honest and fair as to content, (v) provide for fair and expeditious handling of customer complaints and disputes and (vi) maintain a system of supervision and monitoring that is reasonably designed to achieve compliance with IMSA Principles.

(t) You will promptly execute and deliver such certificates as the Distributor may from time to time request confirming your compliance with applicable laws and regulations and this Agreement.

(u) In performing your obligations under this Agreement, you will deal exclusively with Qualified Retailers and registered representatives of Qualified Retailers who are licensed insurance agents appointed to the Company ("Qualified Representatives").

(v) You will not adopt, implement, offer or participate in any program, plan, arrangement or service to allocate premiums, considerations or investments with respect to any Variable Company Product for market timing, asset allocation or other purposes, whether conducted under powers of attorney or otherwise, without the prior written consent of the Distributor in each instance.

(w) The Distributor will, at your request, provide you with copies of the Prospectuses without expense. You will provide Prospectuses without expense to Qualified Retailers writing business through you for delivery to prospective purchasers of Variable Company Products. However, Distributor acknowledges and agrees that Qualified Retailers and Qualified Representatives are solely responsible for ensuring that Retail Clients receive a copy of the Prospectus pursuant to any Applicable Regulations.

(x) You will not give any advice to a Qualified Retailer or a Qualified Representative concerning suitability.

(y) You will, at all times during the term hereof, maintain a blanket fidelity bond, including coverage for larceny and embezzlement, issued by a reputable bonding company covering all your directors, officers, employees, representatives and agents, including your Representatives, who have access to funds. Such bond shall be, at least, of the form, type and amount required under FINRA Conduct Rules. The Distributor may from time to time require evidence, satisfactory to Distributor that such coverage is in force, and you will give prompt written notice to the Distributor of any cancellation or change of coverage. You assign all proceeds received from the fidelity bonding company to the Distributor and the Company to the extent of any loss realized or incurred by the Company due to

246295.1                                             4

activities covered by the bond. If there is any deficiency amount, as a result of a deductible provision or otherwise, you will promptly pay to the Company such amount on demand.

## 5.  COMPENSATION

(a) The Distributor will pay, or cause its Affiliates to pay, compensation to you for business produced by Qualified Retailers written through you in accordance with Schedule II attached hereto attached hereto, as the same may be amended from time to time. The Distributor may amend the compensation schedule in Schedule II as to business produced on future Production Dates in its sole discretion by written notice to you. The Distributor shall have sole authority to decide any dispute between Brokerage General Agents as to business written through them.  Compensation will be paid to you in accordance with the Distributor's standard payment procedures in effect from time to time.

(b) In the event that a Qualified Retailer writes business through you, then the Distributor will pay compensation to the Qualified Retailer directly in accordance with the Broker-Dealer and General Agent Sales Agreement between them, and the compensation due and payable to you hereunder will, notwithstanding anything herein to the contrary, be the difference between the compensation which would otherwise be due and payable to you hereunder and the compensation due and payable by the Company or the Distributor to such Qualified Retailer.

(d) Compensation will be payable to you hereunder as long as you are not in default under any material terms and conditions of the Agreement.  No further compensation will be payable hereunder following termination of this Agreement pursuant to paragraph 8.c.

(e) No compensation will be payable hereunder if the Company rejects an application or does not receive the initial premium when due, the purchaser exercises his/her free look right or the Company decides in its sole discretion to refund premiums paid.

(f) No compensation shall be due and payable hereunder in respect of any Variable Company Product if payment of such compensation would constitute a violation of applicable securities laws or regulations or FINRA rules. In the event the Distributor reasonably concludes that payment of compensation hereunder would constitute such a violation, the Distributor will give notice of the same to you and to the Broker-Dealer and hold such compensation in "escrow" until the Distributor receives reasonably satisfactory evidence that such compensation may be paid; provided, however, that the Distributor must receive such evidence or the Broker-Dealer must commence an appeal to FINRA after the Distributor first gives notice that a payment is being withheld.

(g) You will promptly repay to the Distributor any compensation received by you or paid on your behalf that you are not entitled to hereunder.  The Distributor may apply sums payable to you hereunder against any indebtedness you may have to the Company or the Distributor. Your repayment obligations will survive termination of this Agreement.

(h) You shall pay all expenses incurred by you in the performance of this Agreement.

(i) Following termination of this Agreement, the Distributor may, to the extent permitted by law, discharge its obligation to pay compensation due after termination by making a single payment to you at any time after the termination of this Agreement equal to the commuted value of such compensation. The commuted value will be equivalent to the sum of the compensation due, or which would have been due, calculated by the Distributor on the basis of mortality, lapse, and interest rates deemed appropriate by the Distributor in its sole discretion.

## 6.  CONFIDENTIALITY AND PRIVACY

(a) You will keep confidential all information provided by the Distributor or the Company about them or the Variable Company Products, including without limitation business practices, marketing strategies, computer programs, rate manuals and printed and electronic data. You will only use such information for the purposes contemplated herein and shall not disclose any such information, other

than sales materials intended for distribution to Qualified Retailers and customers and rules and procedures issued by the Distributor or the Company for use by Qualified Retailers, to third parties.

(b) You will not use any "nonpublic personal information" as defined in the Gramm-Leach-Bliley Act (the "GLB") or any other information subject to privacy laws or regulations for any purpose or disclose such information to any other person except as otherwise permitted by the GLB or such other law or regulation.

(c) You will safeguard all nonpublic personal information in accordance with the GLB and other applicable privacy laws and regulations. You will promptly notify us if any nonpublic personal information is used or disclosed contrary to this Agreement and take reasonable steps to mitigate any adverse impact or other harm to the Companies, the Distributor and the affected individuals.

(d) Upon termination of this Agreement, you will, if feasible, return to Distributor or destroy all nonpublic personal information you maintain in any form and retain no copies, and if such return or destruction is not feasible, to extend the protections of this Agreement to the nonpublic personal information beyond the termination of this Agreement and for as long as you have nonpublic personal information, and you agree that any further use or disclosure of the nonpublic personal information will be solely for the purposes permitted hereunder prior to termination. Destruction without retention of copies is not deemed feasible if prohibited by the terms of this Agreement or by Applicable Law, including record retention requirements under state insurance laws.

## 7. INDEMNITY

You will indemnify and hold the Company and the Distributor harmless from and against any actual or threatened liabilities, losses, costs, claims and damages, including reasonable legal fees and expenses, arising out of or based upon any default by you hereunder, or arising out of or due to your negligence or misconduct on your part. The Distributor will indemnify and hold you harmless from and against any actual or threatened liabilities, losses, costs, claims and damages, including reasonable legal fees and expenses, arising out of or based upon any default by the Distributor and Company hereunder, or arising out of or due to their negligence or misconduct on their part.

## 8. TERMINATION

(a) This Agreement may be terminated by either party upon the giving of thirty (30) days prior written notice, and neither party shall thereafter have any rights or obligations hereunder except that Articles 5, 6, 7 and 9 will survive termination.

(b) This Agreement shall automatically terminate (i) in the event you are no longer registered as a securities broker/dealer under the 1934 Act, a member in good standing of FINRA or licensed or registered as a securities broker/dealer in any state that requires such licensing or registration, (ii) upon your dissolution, bankruptcy or insolvency and neither party shall thereafter have any rights or obligations hereunder except that Articles 5, 6, 7 and 9 will survive termination.

(c) This Agreement may be terminated by either party upon the giving of 15 days written notice following any default of the material provisions of this Agreement by the other in the performance of its obligations hereunder and failure to cure pursuant to a 15 day notice of default.

## 9. ARBITRATION

Any controversy, claim or dispute of any kind whatsoever arising out of or relating to this Agreement or any actual or alleged breach thereof shall be resolved by submitting such controversy, claim or dispute to binding arbitration administered by FINRA under the arbitration rules of FINRA then in effect. In the event FINRA declines to hear such controversy, claim or dispute, it shall be resolved by submitting the same to binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules then in effect. Judgment on any award rendered by the arbitrators may be entered in any court, state or federal, having jurisdiction thereof. It is agreed by

the parties hereto that exemplary damages and/or punitive damages will not be recoverable and will not be requested by any party hereto.

## 10. GENERAL PROVISIONS

(a) <u>Assignments.</u> You may not assign any rights or delegate any obligations hereunder without the prior written consent of the Distributor, which shall not be unreasonably withheld.

(b) <u>Entire Agreement.</u> This Agreement contains the entire agreement between the parties.

(c) <u>Amendments.</u> Except as otherwise provided herein, this Agreement may not be altered, interpreted, amended, or modified except by a writing signed by you and the Distributor.

(d) <u>No Waiver of Provisions.</u> The failure of any party to enforce any provision of this Agreement does not constitute a waiver of that provision. No waiver of any provision shall be effective unless such waiver is stipulated in writing and signed by the Distributor and shall not constitute a waiver of such provision in the future except as specifically provided therein.

(e) <u>Prior Agreements.</u> This Agreement replaces all prior agreements between you and the Distributor and/or the Company as to the wholesaling activities described herein from and after the date hereof. This Agreement does not effect your status as a Qualified Retail pursuant to the Broker-Dealer and General Agent Sales Agreement between us which will continue in accordance with its terms.

(f) <u>Counterparts.</u> This Agreement may be executed in two or more counterparts, each of which taken together shall constitute one and the same instrument.

(g) <u>Severability.</u> If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby.

(h) <u>Notices.</u> All notices under this Agreement shall be given in writing. Each such notice shall be either hand delivered or transmitted by overnight carrier or certified United States mail, return receipt requested, to the last known address of the addressee and shall be effective upon delivery.

(i) <u>Authorized Representative.</u> No writing shall be of any force or effect as against the Distributor or the Company unless signed on its behalf by William Terry or such other person as may be designated in writing by a Senior Vice President of the Distributor.

(j) <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(k) <u>Effective Date.</u> This Agreement will take effect on the date, following receipt by the Distributor of a signed counterpart of this Agreement from you, on which the Distributor enters into this Agreement, as set forth below.

## 11. DEFINITIONS

(a) "Approved Sales Materials" means illustrations, software, brochures, sales scripts, seminar or other types of presentations, advertising, direct mailings and any other sales materials relating to the Company or the Variable Company Products provided to you by the Company or the Distributor.

(a) "Company" means AXA Equitable Life Insurance Company, MONY Life Insurance Company, MONY Life Insurance Company of America, or an insurance company affiliate or subsidiary of any of the foregoing, as the case may be, which is the issuer of a particular policy or contract.

(b) "Compensation" means compensation, whether called commissions, service fees, or any other name, of any kind payable under this Agreement.

(c) "Distributor" means AXA Distributors, LLC and its insurance agency subsidiaries entering into this Agreement below.

(d) "FINRA" means the Financial Industry Regulatory Authority.

(e) "1934 Act" means the Securities Exchange Act of 1934, as amended.

(f) "Production Date" means the date, following satisfaction of all outstanding requirements and payment of the initial premium, on which a particular policy or contract issued by the Company is placed in full force and effect as a result of your efforts and/or those of the Qualified Retailer.

(g) "Prospectuses" shall mean all product prospectuses, trust prospectuses and statements of additional information relating to the Variable Company Products and such other materials as the Distributor shall determine to be necessary or desirable to distribute to prospective purchasers of the Variable Sales Products, which have been filed with the Securities and Exchange Commission ("SEC"), if the Variable Company Product is registered with the SEC and other applicable regulators, if required.

(f) "Qualified Retailer" means (1) a licensed insurance agency which is also a broker-dealer or (2) a licensed insurance agency and its associated broker-dealer, which is in either case authorized to sell and service Variable Company Products directly to purchasers pursuant to a Broker-Dealer and General Agent Sales Agreement with the Distributor.

(g) "SEC" means the Securities and Exchange Commission.

(h) "Traditional Company Products" means the life insurance products issued by a Company that are not subject to regulation by the SEC.

(i) "Variable Company Products" means life insurance products issued by a Company that are subject to regulation by the SEC, as the same may be included from time to time on Schedule 1.

(j) "You" and "your" shall mean the entity signing this Agreement as the Brokerage General Agent/Broker-Dealer below.

This Agreement is entered into by the following parties as of March 13, 2008.

Brokerage General Agent/Broker-Dealer:

Distributor:

The Leaders Group, Inc.

By: _____
Name: David B. Wickersham
Title: President

AXA Distributors, LLC
AXA Distributors Insurance Agency, LLC
AXA Distributors Insurance Agency of
Massachusetts, LLC

By: _____
Name: William J. Terry
Title: Vice President

Schedule I
To
**Brokerage General Agent Sales Agreement**

**Effective Date: June 22, 2009**

(Subject to State Availability)

## AXA Equitable Life Insurance Policies

Incentive Life Legacy  (New York and Puerto Rico only)
Policy Form Number 06-100 or state variation

Incentive Life Optimizer, Series 149
Policy Form Number:  08-200 or state variation

Incentive Life Optimizer with Cash Value Plus Rider, Series 149
Policy Form Number:  08-200 or state variation with R07-80 or state variation

**MONY Life Insurance Company (MONY) Life Insurance Policies
MONY Life Insurance Company of America (MONY AMERICA) Life Insurance Policies**

Incentive Life Legacy
Policy Form Number 06-100 or state variation

Schedule II
To
**Brokerage General Agent Sales Agreement**

**Effective Date: June 22, 2009**

## Compensation for Life Insurance Policies

Compensation will be paid under the Brokerage General Agent Sales Agreement ("Agreement") with respect to each Life Policy in accordance with the compensation schedules listed below and attached hereto and the other provisions of this Schedule. All premium-based compensation due and payable will be paid to the General Agent which is the Broker of Record of the Life Policy on the date the Premium is received.

## Calculating Compensation

Unless otherwise specified, compensation will be calculated with respect to any Policy in accordance with the attached compensation schedule for the Policy as a percentage of Premiums actually received during the first ten Policy Years and will be payable from time to time following receipt of the relevant Premiums in accordance with the Distributor's standard payment procedures. Payment of compensation will be suspended if a Policy is in its grace period pending payment of the Premium due or termination of the Policy.

As used herein, a "Policy Year" is a one-year period beginning on the Register Date specified in the Life Policy or on any anniversary date thereof, and "Commissionable Target Premium" or "CTP" is the amount set forth in the illustration (or conforming illustration) for the Life Policy in question as the Commissionable Target Premium. Commissionable Target Premiums may be tiered. Individual tiers are referred to as "CTP 1", "CTP 2", etc. All other terms used herein shall, unless otherwise defined, have the meaning given such terms of the Agreement.

## Special Compensation Provisions

Special compensation provisions set forth in the attached compensation schedules may apply with respect to specific Policies. In the event of any inconsistency between the general provisions of this Schedule II (other than as to maximum compensation as provided below) and the provisions of any attached compensation schedule, the provisions of the compensation schedule will apply.

## Maximum Compensation

Notwithstanding anything to the contrary herein or in the compensation schedules attached hereto, all compensation provided for herein shall be subject to and paid in accordance with Section 4228 of the New York Insurance Law and the regulations thereunder, and neither the Company nor the Distributor shall have any obligation to pay any compensation in excess of the limits established thereunder. All sums, if any, paid under the Agreement in excess of the limits provided in Section 4228 shall be promptly returned to the Distributor upon demand.

### Replacements

In the event that a life insurance policy or an annuity contract issued by the Company (a "Replaced Policy") is surrendered, changed or exchanged in order to purchase a Company Product, compensation will only be due and payable on new money (i.e., not values from the Replaced Policy), with the exception of a term conversion as described below. Such compensation will be paid in accordance with the replacement rules and procedures of the applicable insurer with respect to replacements then in effect. Please contact the Distributor before submitting an application for a replacement policy to obtain the latest replacement rules and procedures.

### Term Conversion

If a client converts a term life insurance policy issued by the Company into a Life Policy, compensation will be due and payable hereunder on the portion of the premiums for which the client receives a term conversion credit in accordance with the rules and procedures of the applicable insurer with respect to conversion credit compensation then in effect.  Please contact the Distributor before submitting an application for a conversion to determine if a term conversion credit is available for the product in question and, if so, whether or not the credit is commissionable. If the credit is commissionable, compensation will be paid on the amount of the credit at a rate equal to fifty (50%) percent of the compensation which would otherwise be due and payable.  Compensation will be paid on premiums received in excess of the credit, whether or not the credit is itself commissionable, at the rates set forth in Schedule II.

### Recovery of Compensation in Specified Circumstances

In the event that a Premium is returned because the insurer rejects the application for the Policy under which such Premium has been paid or because the Premium, or the related application, is not timely received as required herein, or a refund is made because a purchaser exercises his or her free look right under a Policy, or the applicable insurer or the Distributor learns that information was omitted or falsified in an application or that there was any other abuse in connection with the sale of the Policy then, in any such event, upon request from the Distributor, you shall promptly repay to the Distributor any and all compensation received by you, based on all Premiums paid into the Policy, and shall pay any loss incurred as a result of a Premium being returned. You shall also repay, promptly following demand, all compensation paid to you in respect of Premiums paid pursuant to any specialized underwriting arrangement agreed to by the parties in a separate underwriting letter, if the requirements for such arrangement as described in such underwriting offer letter are not satisfied.

### Right of Offset

In addition, and without limiting any provisions of the Agreement, the Distributor shall have a right to set off any sums payable by you to the Distributor against any monies payable by the Distributor to you under the Agreement, including this Schedule II, to the extent permitted by applicable law.  This right on the part of the Distributor shall not prevent the Distributor from pursuing any other means or remedies available to recover such sums.

### Compensation Deferrals

The compensation schedules for some products contain compensation deferral provisions. Where the payment of compensation is deferred, the deferred payments will be made to the General Agent which is the Broker of Record on the date the Premium was received, even if the General Agent is not the Broker of Record on the date a deferred payment is made. All deferred compensation, if any, remaining unpaid on the death of the insured (or last surviving insured if the policy is a survivorship product) will be paid following payment of the death claim under the policy. However, no compensation will be due and payable following the lapse or surrender of a policy or the recovery of compensation already paid as otherwise provided herein.

## Schedule II
## To Brokerage General Agent Sales Agreement

### AXA Equitable Life Insurance Company

| Product | First Year Compensation | | Renewal Compensation | | Asset-Based Compensation | |
|---|---|---|---|---|---|---|
| | Up to CTP | Excess | Years 2-10 | Years 11+ | Years 6-10 | Years 11+ |
| Incentive Life[sm] Legacy[1] (NY & PR only) through 10/5/2008 | 115% | 4% | 2.8% | 0% | 0% | 0% |
| Incentive Life[sm] Legacy[1] (NY & PR only) beginning 10/6/2008 | 115% | 4% | 2.8% | 0% | 0% | 0% |
| Incentive Life Optimizer[1], Series 149 | 110% | 4% | 2.8% | 2% | 0.15% | 0.10% |
| Incentive Life Optimizer with Cash Value Plus Rider, Series 149 | 55% | 4% | Yrs 2 – 6 10.5%* Yrs 2 – 10 2.8% | 0% | 0.15% | 0.10% |
| Survivorship Incentive Life , Series 149 | 110% | 4% | 2.8% | 0% | 0% | 0% |

\* Deferred Compensation is paid in policy years 2-6 on premiums received up to the commissionable target premium during the first policy year for policies with the CVPlus rider. The policy must be inforce at the beginning of the policy year to earn that year's deferred first-year commission. Any unpaid deferred first-year compensation is paid in a single sum if the policy terminates due to the death of the insured during the deferral period.

CTP is the amount set forth in the illustration (or conforming illustration) for the Life Policy in question as the Commissionable Target Premium. The CTP will be reduced after a requested face amount decrease. This reduction in CTP affects Face Amount Increase first year compensation only.

Asset-Based Compensation is paid on the unloaned Policy Account Value at an annualized rate, beginning at the end of the 1st calendar quarter in policy year 6.

Computation of Asset Based Trail Compensation: Asset based trail compensation will be paid on Incentive Life Optimizer, Series 149 and Incentive Life Optimizer with Cash Value Plus Rider, Series 149 in addition to premium based compensation, beginning with the first calendar quarter beginning on or after the first day of the 6th Policy Year. Asset based trail compensation will be calculated as a percentage of the unloaned account value of a Policy and will be paid after the last day of each such calendar quarter. The percentage used to calculate each quarterly payment will be 25% of the annual percentage for the applicable Policy Year as shown above. No trail compensation is payable if the Policy is in grace status as of the end of the calendar quarter. In addition, no trail compensation is paid on terminated Policies or if there is a death claim pending. If a Policy is later reinstated, it will be eligible for trails in the calendar quarter immediately following the date of reinstatement- but no "skipped" trail compensation will be paid.

### [1]Face Amount Increases:
In the event the face amount of any Incentive Life Optimizer or Incentive Life Legacy policy is increased after issuance, the first-year compensation rate will apply to the portion of the requested face amount increase which exceeds the highest historical face amount. The Policy Year for the increase begins on the day the face amount increase is effective (i.e., the first day of the first month following the approval of the face amount increase). Each eligible face amount increase adds a separate commissionable layer to the policy. First Year and renewal compensation is paid on the portion of the premium attributed to the face amount increase as set forth above. The rate we pay on a face amount increase is the rate that is in effect on the date the face amount increase is effective. Face amount increases are not available with policies that have the Cash Value Plus Rider.

## Schedule II
## To Brokerage General Agent Sales Agreement

### Effective Date: June 22, 2009

#### MONY Life Insurance Company
#### MONY Life Insurance Company of America

| Product | First Year Compensation | Renewal Compensation Years 2-10 | Excess |
|---------|-------------------------|----------------------------------|--------|
| Incentive Life℠ Legacy[1] through 10/5/2008 | 115% | 2.8% | 4% |
| Incentive Life℠ Legacy[1] beginning 10/6/2008 | 115% | 2.8% | 4% |

[1]**Face Amount Increases**:
In the event the face amount of any Incentive Life Optimizer or Incentive Life Legacy policy is increased after issuance, the first-year compensation rate will apply to the portion of the requested face amount increase which exceeds the highest historical face amount. The Policy Year for the increase begins on the day the face amount increase is effective (i.e., the first day of the first month following the approval of the face amount increase). Each eligible face amount increase adds a separate commissionable layer to the policy. First Year and renewal compensation is paid on the portion of the premium attributed to the face amount increase as set forth above. The rate we pay on a face amount increase is the rate that is in effect on the date the face amount increase is effective. Face amount increases are not available with policies that have the Cash Value Plus Rider.

## Schedule II
## To Brokerage General Agent Sales Agreement

### AXA Equitable Life Insurance Company

**Commission Chargebacks**
Compensation paid on any Incentive Life Optimizer with CV Plus Rider is subject to a chargeback if such Life Policy is surrendered or terminated for any reason other than death of the insured or the last surviving insured, respectively, in the first two Policy Years. In such event, the General Agent shall promptly repay to the Distributor a portion of all commissions and expense allowances paid in respect of such terminated or surrendered Life Policy according to the following schedule:

| Termination Month | Recovery Percentage | Termination Month | Recovery Percentage |
|-------------------|---------------------|-------------------|---------------------|
| 1-12 | 100.00% | 19 | 41.67% |
| 13 | 91.67% | 20 | 33.33% |
| 14 | 83.33% | 21 | 25.00% |
| 15 | 75.00% | 22 | 16.67% |
| 16 | 66.67% | 23 | 8.33% |
| 17 | 58.33% | 24 | 0% |
| 18 | 50.00% | | |

**Applicable to policies issued in all states:**
For surrender/forfeiture of any policy that uses a standard 12 month period for determining first year compensation, a chargeback for any unearned premiums will apply.

# Exhibit 5

CARL A. DEUTSCH (1924 - 2010)
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. PUDMAN
MICHAEL J. DEVINE
STUART BERKS (1941 - 2008)
KENNETH W. FUNK
PHILLIP J. ZISOOK
ALVIN J. HELFGOT
JOEL A. STEIN
DENNIS E. FRISBY
BRIAN D. SAUGIER
AARON B. ZARROWSKY
LEO G. AUREL
KAREN KAVANAGH MACK
JEFFREY E. SCHILLER
DAVID J. BEN-DOV
MARGERY NEWMAN
JEFFREY B. HORWITZ
HAL "CORKY" KESSLER
ROBERT S. STRAUSS
KENNETH S. STRAUSS

LAW OFFICES

# DEUTSCH, LEVY & ENGEL

CHARTERED

SUITE 1700

225 WEST WASHINGTON STREET

CHICAGO, ILLINOIS 60606

(312) 346-1460

E-mail: lawyers@dleo.com
Website: www.dleo.com
FACSIMILE: (312) 346-1859

LEE C. FARDMAN
PHILLIP J. SALERNO II
EMILY R. MAGALSKI
JENNIFER ROJAS
STEVE RAMINIAK
TIMOTHY M. SWANSON
ERIKA TOVAR
VANESSA E. SEILER
KATY SOURK
ANCA TATOIU

COUNSEL
PAUL M. LEVY
MARSHALL D. KROLICK
MELVYN H. BERKS

July 24, 2012

*Via Federal Express*

AXA Equitable Life Insurance Company
AXA Advisors, LLC
**Attn.: Mr. Mark Pearson**
1290 Avenue of the Americas
New York, NY 10104

AXA Network, LLC
**Attn.: Mr. Andrew McMahon**
1290 Avenue of the Americas
New York, NY 10104

Dear Messrs. Pearson and McMahon:

Please be advised that we represent Matthew A. Mooney. Our client was a former AXA Advisors Financial Professional, having terminated his affiliation with AXA as of May 1, 2012.

Our purpose in writing you is twofold. First, on September 1, 2006, our client executed a Trademark License Agreement with AXA Equitable Life Insurance Company and AXA Advisors granting them a non-exclusive license to use the mark, "SARP," for the purpose of marketing annuities and financial services products to various professional groups. Although the License Agreement itself was silent as to the consideration to be paid to our client, AXA agreed to pay our client an amount equal to 1.35% of the value of assets under management on contracts sold by our client under the SARP program. In addition, our client was allowed to enter into various commission sharing agreements with other AXA professionals who desired to utilize the SARP trademark entitling our client to 25% of commissions earned by such other AXA professionals in connection with sales utilizing the SARP program. AXA approved all such commission sharing agreements and made payments to our client based thereon prior to termination of our client's affiliation with AXA.

Upon termination of our client's affiliation with AXA, AXA has refused to pay on-going commissions to our client which were promised as consideration for the Trademark License Agreement and has further failed to honor the commission sharing agreements executed by our client with other AXA professionals with regard to sales made by such other AXA professionals pursuant to the SARP program. We consider such continued refusal by AXA to be in direct violation of its obligations to our client pursuant to his execution of the Trademark License



**EXHIBIT**

5

AXA
Attn.: Messrs. Pearson and McMahon
July 24, 2012
Page 2

Agreement and demand that all past due payments to which he is entitled be immediately paid to him by AXA and that AXA agree that all subsequent payments to which our client is entitled will be immediately paid to him as and when due.

The second issue relates to the intentional and wrongful acts of AXA in denying Mr. Mooney the ability to continue servicing policies which he wrote while a representative of AXA and AXA's intentional acts to destroy the relationships which Mr. Mooney has with his very substantial client base. Upon his resignation from AXA, Mr. Mooney affiliated with the Leaders Group, Inc. as his broker/dealer. The Leaders Group submitted multiple forms provided by AXA pursuant to which Mr. Mooney's clients requested and authorized Mr. Mooney to continue as their representative to continue servicing their contracts. Relying on a provision which AXA had inserted into its Selling Agreement with the Leaders Group, AXA arbitrarily refused to appoint Mr. Mooney as authorized and requested by Mr. Mooney's clients. Pursuant to a letter dated May 31, 2012 from Jeff Craig, AXA's licensing and commission manager, Mr. Mooney was invited to request an exception to the provision in the Selling Agreement quoted by AXA in its refusal to initially grant Mr. Mooney the requested status. Upon the submission of the request for the exception, AXA again summarily refused the request and then notified all of Mr. Mooney's clients holding AXA policies that Mr. Mooney was no longer available to manage their accounts. AXA's conduct interfering with Mr. Mooney's business contacts and relationships has had a severe negative impact upon Mr. Mooney's reputation with his clients and on his continuing business relationships with them. As stated above, such clients had, in fact, specifically authorized that Mr. Mooney be appointed to continue the servicing of their specific insurance and annuity contracts. AXA's intentional interference with Mr. Mooney's business contacts to his detriment and against the express wishes of his clients will not be tolerated. In addition, as in the situation involving sales of policies by Mr. Mooney pursuant to the SARP program, AXA has further refused to make payment to Mr. Mooney of renewal commissions to which he is entitled pursuant to his Associate Agreement with AXA. All of Mr. Mooney's renewal commissions are vested thereunder by reason of his completion of 18 years of continuous service with AXA and having attained substantially more than AXA's requirement of 120,000 production credits.

That part of our client's claims against AXA which relate to monies owed pursuant to the trademark license and for significant renewal commissions to which our client is entitled is relatively easy to resolve by agreement or otherwise by litigation. The second part of our client's claim relates to the intentional and wrongful acts of AXA in attempting to destroy Mr. Mooney's ongoing relationships with his existing clients for whatever reason AXA or certain employees of AXA deemed to be in AXA's best interests and that is more difficult to resolve.

AXA
**Attn.: Messrs. Pearson and McMahon**
July 24, 2012
Page 3

We are writing you to give you a single opportunity to attempt to resolve all of the foregoing issues. Absent an amicable resolution of these outstanding matters, we will consider you as leaving us no alternative but to initiate legal proceedings to obtain an alternative resolution. Should AXA wish to discuss this opportunity, please contact me no later than August 7, 2012.

Very truly yours,

Jerry I. Rudman

JIR:kmn

369576_5



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW MOONEY

                                                    Plaintiffs,

- against -

AXA ADVISORS, LLC, a Delaware Limited Liability Company; AXA NETWORK, LLC, a Delaware
Limited Liability Company; AXA EQUITABLE LIFE INSURANCE COMPANY, a Delaware
Corporation; AXA DISTRIBUTORS, LLC, a Delaware Limited Liability Company; AXA
DISTRIBUTORS INSURANCE AGENCY, LLC, a Delaware Limited Liability Company; AXA
DISTRIBUTORS INSURANCE AGENCY OF MASSACHUSETTS, LLC, a Massachusetts Limited
Liability Company,
                                                    Defendants.

## SUMMONS AND COMPLAINT

WECHSLER & COHEN, LLP
*Attorneys for Plaintiffs*
*Office and* Post *Office Address, Telephone*
17 State Street, 15th Floor
New York, New York 10004
(212) 847-7900

To

Signature (Rule 130-1.1-a)

James F. X. Hiler

Attorney(s) for

Service of a copy of the within                          is hereby admitted

Dated,

Attorney(s) for

Please take notice
    NOTICE OF ENTRY that the within is a (certified) true copy of a
Duly entered in the office of the clerk of the within named court on
    NOTICE OF SETTLEMENT
That an order                          of which the within is a true copy will be presented for
Settlement to the HON                                              one of the judges
Of the within named court, at
On                                   at                          M

Dated,                                              Yours, etc.
                                        WECHSLER & COHEN, LLP
                                                *Attorneys for*
                                        *Office and* Post *Office Address,*
                                        17 State Street, 15th Floor
                                        New York, New York 10004

To

Attorney(s) for