## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW MOONEY<br><br>v.<br><br>AXA ADVISORS, L.L.C., et al. | CIVIL ACTION<br><br>NO.  13-3093 |

## MEMORANDUM OF LAW RE DEFENDANTS' MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART

**Baylson, J.**                                                    **April 10, 2014**

## I.    Introduction

Plaintiff Matthew Mooney is the former employee of an insurance company and has sued the parent and several of its subsidiaries,[1] asserting antitrust claims under § 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), and New York's Donnelly Act, N.Y. Gen. Bus. § 340 (Count II). Plaintiff also asserts claims for defamation per se (Count III); breach of contract, specifically against AXA Network, LLC (Count IV) and AXA Advisors, LLC (Count V); and a claim for "Trademark Compensation Owed," which is effectively another claim for breach of contract, against AXA Equitable Life Insurance Company and AXA Advisors, LLC (Count VI).

AXA has moved to dismiss Plaintiff's Amended Complaint in its entirety for failure to state a claim.  ECF 20.

## II.    Facts[2]

Mooney has approximately nineteen years of experience working in the sale and servicing of insurance products.  Am. Complaint, ECF 15 ¶ 2 (Preliminary Facts).  For

---

[1]  Defendants are AXA Advisors, LLC; AXA Network, LLC; AXA Equitable Life Insurance Company; AXA Distributors, LLC; AXA Distributors Insurance Agency, LLC; and AXA Distributors Insurance Agency of Massachusetts, LLC (collectively, Defendants or AXA)

[2]  These factual allegations are taken from the Amended Complaint.  ECF 15.  They are presumed true for the purpose of adjudicating AXA's motion.  *Farran v. City of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993).

approximately eighteen years, from roughly 1994 to 2012, Mooney was an agent for AXA (or its predecessors).  ECF 15 ¶ 9 (Preliminary Facts).  During that time, Mooney entered into a Trademark License Agreement, in which he licensed to AXA a trademark he owned called "SARP."  ECF 15 ¶¶ 11-13 (Preliminary Facts).  SARP, which stands for "Sales Associate Retirement Program," is a retirement plan designed for independent contractors who may otherwise not have access to traditional retirement planning services through their employer. ECF 15 ¶ 11 (Preliminary Facts).  The Trademark Licensing Agreement does not specify what consideration Mooney was to receive in exchange for granting the license—instead, the agreement only notes that "Licensor acknowledges receipt of satisfactory compensation in consideration of and full payment for the License."  ECF 15 Ex. 3 ¶ 2.  Mooney alleges that this consideration provision refers to an ongoing arrangement in which AXA Advisors agreed to pay him (1) 1.40% of the value of assets under management on the annuity contracts he sold as a registered AXA representative; (2) one quarter of the 3.25% commissions earned by other AXA agents that utilized the SARP mark; and (3) an additional percentage of his own production equaling a 5% total commission.  ECF 15 ¶¶ 12, 13 (Preliminary Facts).  From 2006 to 2012, Mooney and other AXA agents marketed AXA products using the SARP trademark.  ECF 15 ¶ 16 (Preliminary Facts).  During that period, AXA compensated Mooney according to the described commission structure.  ECF 15 ¶ 22 (Preliminary Facts).

Mooney also entered into an Associate Agreement with AXA Network, LLC and a Representative Agreement with AXA Advisors, LLC.  According to the Associate Agreement, Mooney would receive a right to vested commissions, seniority, and other benefits after completing twelve years of continuous service with AXA Network.  ECF 15 Ex. 1 § IV.A.  By the time Mooney resigned, AXA credited Mooney as having had eighteen years of continuous

service as a representative and an associate, notwithstanding a one-year break between June 2002 and June 2003.  ECF 15 ¶ 10 (Preliminary Facts).  This credit was a condition of Mooney's returning to AXA in June 2003.  ECF 15 ¶ 10 (Preliminary Facts).[3]

On May 4, 2012, Mooney resigned his association with AXA.  ECF 15 ¶ 20 (Preliminary Facts).  After learning of his resignation, William Degnan, President of AXA's American Division, told Mooney that his resignation would be accepted but that Mooney would "feel pain" as a consequence.  ECF 15 ¶ 3 (Count III).  Mooney claims that AXA then made efforts to disparage and discredit him in the eyes of his clients.  ECF 15 ¶ 2 (Count III).  Specifically, on or about January 17, 2013, AXA employees Justin Scheef and Greg Emmons met with one of Mooney's clients, Molly Schmittgen, and told her that Mooney "only knew about life insurance," "didn't know anything about investments," "hated helping clients with investing their money," and "invested her in all of the wrong accounts because he didn't know what he was doing."  ECF 15 ¶ 4 (Count III).

After accepting his resignation, AXA stopped compensating Mooney under the Trademark License Agreement but continued to use the SARP mark.  ECF 15 ¶ 23 (Preliminary Facts).  Mooney claims that AXA has breached the Trademark License Agreement by failing to compensate Mooney for its continued use of the mark.  ECF 15 ¶ 2 (Count VI).

Mooney then began working for The Leaders Group, Inc. ("Leaders")—an independent securities broker dealer.  ECF 15 ¶ 1 (Count I).  Leaders and AXA compete with each other in the sale of variable annuities and variable life insurance products, including AXA-brand annuities and AXA-brand variable life insurance products.  ECF 15 ¶ 3 (Count I).  Leaders and AXA also compete with one another for experienced insurance agents to sell these products. ECF 15 ¶ 3 (Count I).

---

[3] The Representative Agreement does not have a twelve-year vesting requirement.  *See* ECF 15 Ex. 2.

To become an AXA broker dealer, Leaders entered into an agreement (the "Broker Dealer Agreement") with AXA, which gave Leaders authority to market AXA-brand variable annuity and variable life insurance products.  ECF 15 ¶ 5 (Count I).  A provision of the Broker Dealer Agreement requires that, in the absence of AXA's written authorization, Leaders cannot appoint as an agent or advisor for the sale of AXA-brand products anyone who has previously worked with AXA for a period of twelve months after the termination of their AXA employment.  ECF 15 ¶ 7 (Count I).

After hiring Mooney, Leaders and Mooney requested that AXA permit his appointment as an agent to market AXA products through Leaders.  AXA denied the request.  ECF 15 ¶ 8 (Count I).  AXA's refusal prevented Mooney from selling AXA products and restrained Leaders from selling AXA products through Mooney.  ECF 15 ¶ 8 (Count I).

In response, Mooney filed this action, claiming that (1) the hiring restriction in the Broker Dealer Agreement is an unreasonable restraint of trade under federal and New York law; (2) the comments made by Justin Scheef and Greg Emmons constitute defamation per se; and (3) AXA and certain of its entities breached the Representative, Associate, and Trademark Licensing Agreements.

## III.   Jurisdiction and Standard of Review

At this stage in the proceedings, the Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Mooney's Sherman Act claim alleges a cause of action under a federal statute.  Mooney also asserts that this Court has jurisdiction under 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000.

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must limit itself to facts stated in the complaint or in documents attached to the

4

complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.*, 937 F.3d 767, 773 (2d Cir. 1991).  The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the nonmoving party. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A plaintiff need only allege facts to state a claim for relief that is plausible on its face.  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  To do this, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.    Sherman Act and Donnelly Act Claims[4]

### A.       Contentions of the Parties

Mooney's position on his antitrust claims has been something of a moving target.  In his Original Complaint, Mooney described the employee restriction in the Broker Dealer Agreement as "unrelated to any legitimate interest of AXA."  Original Complaint, ECF 1 ¶ 10 (Count I). This phrasing alludes to the type of restraint that is treated as per se illegal under the antitrust laws. *See Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977) ("Restraints on postemployment competition that serve no legitimate purpose at the time they are adopted would be per se invalid.").  Aside from this statement, the Original Complaint offered no characterization of what kind of unreasonable restraint AXA had imposed on Leaders.

The Original Complaint had other noticeable omissions.  Although it alleged that the contested provision restricted the market for "insurance agents and representatives," ECF 1 ¶ 9 (Count I), it failed to plead (1) any discussion of substitutes or cross-elasticity of demand; (2) AXA's market share in the relevant market; or (3) how the alleged restraint had an

---

[4]  The New York Court of Appeals has held that the Donnelly Act was modelled on the Sherman Act and should generally be construed in light of federal precedent.  *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994).

anticompetitive effect on the relevant market.  AXA's First Motion to Dismiss pointed out these deficiencies.  AXA's Motion also went on to note that the Original Complaint only alleged harm to Mooney, not the market as a whole.  ECF 11.

Mooney then filed an Amended Complaint, in which he added nineteen additional paragraphs of antitrust-related allegations to the Original Complaint's eleven.  ECF 15.  These additional allegations, however, do not clarify what market was being harmed by AXA's alleged restraint.  At some points, the Amended Complaint seems to allege that the restriction in the Broker Dealer Agreement was a restraint on the insurance product market, ECF 15 ¶ 1 (Preliminary Facts), ¶¶ 27, 28 (Count I); at others points, a restraint on the insurance labor market of experienced AXA employees, ECF 15 ¶ 1 (Preliminary Facts), ¶ 29 (Count I).

Additionally, although the Amended Complaint now alleges AXA's market share, it only describes market share in certain insurance product markets, not in the insurance labor market. *See* ECF 15 ¶¶ 12-13, 18-20, 25 (Count I).  The Amended Complaint also alleges that the restriction in the Broker Dealer Agreement constituted both an unreasonable vertical agreement as well as an unreasonable horizontal agreement—implicitly suggesting that the restraint was both per se illegal *and* unreasonable under the Supreme Court's rule-of-reason doctrine.  ECF 15 ¶ 28 (Count I).

AXA filed a Motion to Dismiss the Amended Complaint.  In its briefing, AXA observed that the Amended Complaint suffers from the same deficiencies as the Original Complaint. AXA argues that Mooney still fails to allege a relevant market because he has not pled any substitutes or explained why no substitutes were available in his proposed market.  AXA also indicates that Mooney has not alleged that AXA had sufficient market share to influence the market by imposing the alleged restraint or that the alleged restraint had a direct anticompetitive

effect on the market.  Finally, AXA again states that Mooney has still only alleged an injury to himself, not an injury to the market as a whole.  ECF 20.

The Court held oral argument on AXA's Motion to Dismiss on March 18, 2014.  At the hearing, Mooney clarified his position on a variety of issues.  First, he indicated that he was not pursuing a per se illegality theory.  Second, in response to the Court inquiring about the Amended Complaint's lack of discussion regarding substitutes, Mooney stated that he did not have to allege substitutes because the relevant market was a labor market, not a product market. He also clarified that the alleged labor market was not for experienced insurance agents in general, but for current AXA and former AXA employees.[5]  In response to the Court's inquiry about why it should accept a single-brand labor market in light of Second Circuit precedent, which generally rejects such a market definition, Mooney cited *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999) for the proposition that pleading a single-brand market can sustain an antitrust claim.[6]

Aside from pointing out the defects regarding market definition, market share, and antitrust injury in Mooney's Amended Complaint, AXA has repeatedly emphasized, both in its briefing and at oral argument, that the restriction in the Broker Dealer Agreement actually promotes competition.  AXA points out that the contested provision only restricts *intra*brand competition—that is, competition among sellers of one particular brand.  Restrictions on *intra*brand competition, AXA notes, support *inter*brand competition, which has procompetitive benefits because it encourages the sale of competing, non-AXA insurance products and thus strengthens the position of AXA's competitors in the marketplace.  ECF 20 at 19-20 (citing

---

[5]  The Court refers to Mooney's characterization of the relevant labor market as "AXA-affiliated employees" or "AXA-affiliated agents."

[6]  As discussed *infra*, *Bogan* offers no support for such a proposition.

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n.19 (1977) (noting that interbrand competition, rather than intrabrand competition, is the "primary concern of antitrust law"); *Gatt Commc'ns, Inc. v. PMS Assocs.*, LLC, 711 F.3d 68. 77 (2d Cir. 2013) ("[I]nhibitions on intrabrand competition . . . lie far from the core [Section] 1 violations that are likely to give rise to antitrust injury." (alteration in original)); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg., Co.*, 61 F.3d 123, 127-28 (2d. Cir. 1995)).  Because the restriction inures to the benefit of AXA's competitors, AXA argues that this restriction does not harm competition within the marketplace.

### B.    Rule of Reason

Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  To state a claim under § 1, the plaintiff must allege "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason."  *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998).[7]

Rule-of-reason analysis generally guides a district court's inquiry when determining the existence of an unreasonable restraint on trade.  *See Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 726 (1988) ("[T]here is a presumption in favor of a rule-of-reason standard . . . .").  "Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact . . . ."  *Kasada, Inc. v. Access Capital, Inc.*, Case No. 01-cv-8893, 2004 WL 2903776, at

---

[7]  Plaintiff has alleged a written agreement between Leaders and AXA that delineates the alleged unreasonable restraint raised in the Amended Complaint.  This is sufficient to satisfy the concerted action element of Plaintiff's § 1 claim.

*4 (S.D.N.Y. Dec. 14, 2004).  After weighing the anticompetitive consequences of a practice against its procompetitive justifications, the court then determines whether the restraint is reasonable—that is, whether it is more beneficial to competition than harmful.

However, if the alleged restraint falls into the category of agreements or practices that have been condemned by the Supreme Court as being obviously anticompetitive and contrary to the policies underlying the Sherman Act, then the court does not engage in a reasonableness analysis—the restraint is simply presumed per se illegal.

"The categories of *per se* illegal practices are an approximation, a shortcut to reach conduct that courts can safely assume would surely have an anticompetitive effect."  *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999).  Agreements between competitors at the same level of the market structure that involve price fixing, territory allocation, the orchestration of group boycotts or concerted refusals to deal, or other competition-minimizing activities—commonly referred to as "horizontal restraints"—are examples of practices that receive per se treatment under § 1 of the Sherman Act.  *See, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212 (1959) (finding group boycotts unreasonable per se); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 228 (1940) (finding price fixing unreasonable per se).  By contrast, agreements between persons or entities at different levels of a market structure, such as between a manufacturer and distributor—commonly referred to as "vertical restraints"—are analyzed under the rule of reason.  *See GTE Sylvania, Inc.,* 433 U.S. at 58–59 (holding non-price vertical restrictions are analyzed under the rule of reason); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 907 (2007) (holding vertical price restraints are judged according to the rule of reason).

Classifying the nature of the restraint alleged—and thus identifying the doctrine to govern the analysis—is critical at the motion to dismiss phase, for it determines what factual material the plaintiff must plead in order to state a claim.  Under rule-of-reason analysis, to sufficiently plead an unreasonable restraint on trade, the plaintiff must allege facts that describe the challenged restraint, the contours of the relevant market, the anticompetitive effects the restraint has on that market, and an injury suffered by the plaintiff that the antitrust laws were intended to prevent and that flows from that which makes the restraint unlawful.  *Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television Div. of Twentieth Century-Fox Film Corp.*, 622 F. Supp. 1532, 1538-39 (S.D.N.Y. 1985).

By contrast, under per se analysis, the plaintiff need not allege anticompetitive effects. As described above, the law regards practices that are per se illegal as so unwaveringly noxious to competition that their anticompetitive effect is presumed.  *See Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) ("*Per se* violations do not require a showing of deleterious impact on competition. The acts involved are considered so repugnant to the policies underlying antitrust law that they create a presumption of anticompetitive effect."). The plaintiff therefore need only plead facts describing the challenged conduct and the relevant market affected by the conduct.  *See Bogan*, 166 F.3d at 515 ("[I]t is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur.").

Because Mooney represented at oral argument that he was not pursuing a per se theory, the Court reviews the sufficiency of the Amended Complaint under the rule of reason.

i.     **Relevant Market**

"In order to plead an antitrust violation under the rule of reason, a plaintiff must allege a relevant market, including both a product market and a geographic market." *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010).[8] "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). "[T]wo products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *Todd v. Exxon Corp.,* 275 F.3d 191, 201-02 (2d Cir. 2001) (citations omitted) (Sotomayor, J.). "Dismissal is appropriate where the alleged product market is defined without 'reference to the rule of reasonable interchangeability and cross-elasticity of demand' or where it 'clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor.'" *Integrated Sys.*, 713 F. Supp. 2d at 298 (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)).

Here, Mooney alleges that the relevant market is the labor market for current and former "experienced and trained [AXA] representatives and associates." ECF 15 ¶ 29 (Count I). As AXA points out in its briefing, ECF ¶ 20 at 14, the complaint does not allege any substitutes for AXA-affiliated employees or provide a discussion of cross-elasticity of demand. There is no discussion about the insurance agent labor supply, the existence of other insurance agents that are not affiliated with AXA, potential barriers to entry into the insurance agent market, or

---

[8] Mooney has alleged that AXA sells insurance across the United States. ECF 15 ¶ 5 (Preliminary Facts). This is sufficient to plead a relevant geographic market. The Court's inquiry centers on the allegations surrounding the relevant product market.

systemic barriers that might prevent an agent from changing insurance employers.  This is a critical deficiency of the complaint.

In his briefing, Mooney responded to the failure to allege substitutes and cross-elasticity in a footnote:

> The labor market cases (as opposed to product market cases) do not discuss the elasticity of the market.  However, the implication of AXA's admissions is that the market for experienced professional [sic] is inelastic, in that AXA makes efforts to retain its people, rather than replace them.

ECF 23 at 11 n.2.  Mooney offered no case citations for the proposition that antitrust complaints that plead a labor market as the relevant market are somehow excused from discussing cross-elasticity or substitutes.

Indeed, the case law directly contradicts Mooney's contention.  In *Todd*, the plaintiff alleged that the defendant unreasonably restrained the labor supply for nonunion managerial, professional, and technical employees by exchanging detailed compensation information with competitors so that the colluding companies could set their employees' salaries at artificially low levels.  275 F.3d at 195.  In reviewing the dismissal of the complaint, the Second Circuit conducted a thorough analysis of the cross-elasticity of demand and potential substitutes alleged in the complaint, particularly regarding whether the alleged labor market was over-inclusive and under-inclusive as pled. *Id.* at 199-204.

Similarly, in *Bogan*, the plaintiffs alleged that defendants unreasonably restrained the labor supply for Northwestern Mutual Life ("NML") insurance agents by maintaining agreements that prevented agents that worked for one General Agent from switching to work for another General Agent.  166 F.3d at 515-16.  Although the plaintiffs' primary theory was rooted in per se illegality, the Second Circuit observed that the plaintiffs' case could have been salvaged had they pled that the market for experienced NML agents was a cognizable submarket of the

wider insurance agent labor market. *Id.* The court noted, however, that the plaintiffs could not rely on this approach because they failed to make any effort to demonstrate the cross-elasticity of demand between NML agents and other labor substitutes. *Id.* at 516.

At oral argument, and with passing reference in his brief, Mooney offered an alternative theory. He suggested that the relevant market was a single-brand market—that is, that there were no substitutes for AXA-affiliated employees because they were a market unto themselves.

In the past, antitrust plaintiffs have attempted to define the relevant market as a single brand of product or service, thereby sidestepping the need to allege cross-elasticity of demand or any reasonably interchangeable substitutes. The Supreme Court has opined on the conceptual problems that accompany overly-narrow market definitions. The Court's holdings and observations, which have been echoed many times across this circuit, express skepticism for single-brand markets:

> A retail seller may have in one sense a monopoly on certain trade . . . because no one else makes a product of just the quality or attractiveness of his product . . . . Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufactures have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392-93 (1956).[9]

Accordingly, absent allegations explaining why such a market definition is plausible, courts in this district consistently reject single-brand markets. *See Todd*, 275 F.3d at 200 ("Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand . . . or (2) failure even to attempt a plausible explanation

---

[9] Although *E.I. du Pont* concerned a § 2 monopolization claim, the concerns expressed in the opinion about single-brand markets have been cited widely in cases with § 1 claims. *See, e.g.*, *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001).

as to why a market should be limited in a particular way."); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001) ("[C]ourts have consistently held that a brand name product cannot define a relevant market."); *e.g.*, *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391-92 (S.D.N.Y. 1993) (one particular brand of health education materials is not a relevant product market); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 153-55 (S.D.N.Y. 1988) (sales of selected tickets to Phantom of the Opera do not comprise a viable antitrust market).

The widespread rejection of single-brand markets is not some creature of brittle formalism.  Rather, courts rebuff these market definitions because single-brand markets— whatever their theoretical possibility—are consistently pled in a manner that lacks plausibility or is otherwise untethered to economic reality.  *See Theatre Party Assocs.*, 695 F. Supp. at 154 ("The federal courts, in the context of Rule 12 motions to dismiss, have not hesitated to reject market allegations that make no economic sense under any set of facts.").  Thus, although the Court is not willing to reject the alleged single-brand market out of hand, it is incumbent upon Mooney to plead why such a market is plausible.  *See Beyer Farms v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) ("[An antitrust plaintiff must] explain why the market it alleges is in fact the relevant, economically significant product market."); *Int'l Audiotext Network, Inc. v. AT&T*, 893 F. Supp. 1207, 1213 (S.D.N.Y. 1994) ("[A]n antitrust plaintiff must set out a theoretically rational explanation to support its proposed relevant product market."); *N. Jersey Secretarial Sch., Inc. v. McKiernan*, 713 F. Supp. 577, 583 (S.D.N.Y. 1989) (dismissing complaint because the plaintiff "fail[ed] to explain the basis" for the market alleged); *Gianna Enters.*, 551 F. Supp. at 1354 (dismissing complaint for failure to adequately plead a relevant

market where plaintiff alleged a market limited to international beauty pageants but "made no attempt to explain" why the product market should be so limited).

Mooney argues that AXA's representations in a 2011 Form 10-K securities filing about its strategy "to retain personnel, rather than replace them" demonstrates that the AXA-affiliated agent market is "inelastic"—that is, has no substitutes.  ECF 23 at 11 n.2.  Mooney quotes extensively from the 10-K filing in an attempt to support this contention.  *See, e.g.*, ECF 15 ¶ 15 (Count I) ("[AXA's] proprietary sales force and key employees are key factors driving our sales.") (quoting AXA's 2011 Form 10-K); ECF 15 ¶ 14 (Count I) ("[AXA] must attract and retain productive sales representatives to sell [AXA's] products.") (quoting AXA's 2011 Form 10-K).  Mooney argues that these statements "concede" the existence of his alleged labor market.  ECF 23 at 6.

Mooney's argument misses the mark.  As an initial matter, the expressed preferences of a labor purchaser are insufficient to define the contours of a particular market.  *See City of New York v. Grp. Health, Inc.*, 649 F.3d 151, 156 (2d Cir. 2011) ("A single purchaser's preferences, however, cannot define a market.").  Although retaining experienced AXA insurance agents may be particularly suitable to AXA's needs, this mere preference does not serve as a plausible explanation—or any explanation, for that matter—for why the court should treat AXA-affiliated agents as a single-brand market.

Indeed, the allegations in Mooney's complaint suggest that the market for insurance agents, including AXA-affiliated agents, is very elastic—that is, has many substitutes.  For instance, quoting from AXA's 2011 Form 10-K, the complaint alleges:

- We compete with other financial institutions for sales representatives;

- Intense competition exists among insurers and other financial service companies for financial professionals and key employees;

•Competition is particularly intense in the hiring and retention of experienced financial professionals, ECF 15 ¶ 15 (Count I).

ECF 15 ¶¶ 14-15 (Count I). Thus, on the basis of the allegations of the complaint alone, it is clear that the insurance agent market, of which AXA-affiliated employees are a part, is an intensely competitive market. Mooney has offered no explanation for why the Court should regard the market for AXA-affiliated employees as a distinct labor submarket, other than that AXA has exhibited a preference for retaining personnel over hiring new personnel. This cannot sustain Mooney's alleged market.

Without alleging all reasonably interchangeable substitutes for AXA-affiliated employees or alleging a plausible explanation for why the Court should regard competition for AXA-affiliated employees as a market unto itself, Mooney has failed to adequately allege a relevant market. This is an essential element to stating a claim under § 1 of the Sherman Act and the Donnelly Act. Accordingly, AXA's Motion will be granted as to these claims.

### ii.     Other Deficiencies

Mooney's antitrust claims are deficient in additional ways. In order to state an antitrust claim under the rule of reason, Mooney must allege that the alleged restraint harmed competition in his proposed market. He could satisfy this requirement by alleging facts that show that the alleged restraint had "an actual adverse effect on competition, such as reduced output," or by demonstrating an adverse effect "indirectly by establishing that [AXA] had sufficient market power to cause an adverse effect on competition." *Tops Markets, Inc.*, 142 F.3d at 96. Market power is a "surrogate" for pleading an actual adverse effect on the market. *F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 461 (1986). If an entity controls a large share of the market, then a court may infer that a potentially unlawful restraint has the potential for "genuine adverse

effects on competition" without allegations detailing that genuine adverse effect.  *Id.* at 460-61.

The complaint fails to allege either adverse effect or market power.

Assuming for a moment that Mooney's proposed relevant market—AXA-affiliated

insurance agents—is cognizable under the antitrust laws, Mooney has failed to allege that the

market has been adversely affected as a result of the contested provision in the Broker Dealer

Agreement.  Mooney avers that market competition has been harmed because the restriction

prevents AXA-affiliated agents from selling AXA-affiliated products if they choose to work at

another company—which chills insurance agents from leaving their employment at AXA.  ECF

15 ¶ 27 (Count I).  This allegation, however, fails to explain how competition is directly harmed

given that AXA-affiliated employees can still sell *other* brands of insurance.  The restriction in

the Broker Dealer Agreement only limits their sale of AXA products, which necessarily implies

that the restriction encourages former AXA employees to sell non-AXA products.  Mooney has

failed to plausibly allege how this dynamic harms competition, for it very plainly seems to

encourage AXA-affiliated agents to sell the products of AXA's competitors—which would

increase competition, not diminish it.  *See GTE Sylvania, Inc.*, 433 U.S. at 52 n.19 (noting that

interbrand competition, rather than intrabrand competition, is the "primary concern of antitrust

law").

Additionally, Mooney's inability to plead a cognizable market renders him unable to

plead market power.  On the one hand, if Mooney had successfully alleged a single-brand

market, then AXA would obviously have market power over insurance agents that work for

AXA.  This market, as discussed *supra*, is not plausible.  On the other hand, had Mooney alleged

reasonably interchangeable substitutes in the market for AXA-affiliated employees, his claim

would still fail because, although he alleges AXA's share of several insurance product markets,

he alleges no facts about what percentage of the relevant insurance *labor* market AXA controls. Accordingly, the complaint is deficient as to Mooney's antitrust claims because it fails to allege either direct anticompetitive effects or market power from which anticompetitive effects may be inferred.

## V. Breach of the Associate and Representative Agreements[10]

### A. Contentions of the Parties

The Amended Complaint alleges that AXA Network and AXA Advisors breached the Associate Agreement and the Representative Agreement, respectively, by failing to pay commissions that had vested in Mooney. According to the Associate Agreement, commissions will vest in Mooney after twelve years of continuous service.[11] ECF 15 Ex. 1, § IV.A. Mooney alleges that AXA had "credited" Mooney with eighteen years of continuous service by the time he resigned. He also alleges that, as a result of this crediting, AXA regularly paid Mooney commissions, service fees, and other compensation under both the Associate and Representative Agreements. ECF 15 ¶ 22 (Preliminary Facts). According to the complaint, AXA ceased paying him commissions under these agreements after he left AXA on May 4, 2012.[12] ECF 15 ¶ 23 (Preliminary Facts).

---

[10] Counts IV, V, and VI are governed by New York law.

[11] Unlike the Associate Agreement, the Representative Agreement does not expressly state when commissions will vest in Mooney; rather, it only provides that commissions may be paid according to schedules and rules that AXA Advisors may publish from time to time. ECF 15 Ex. 2, § III. Mooney, however, alleges that he was entitled to vested commissions from AXA Advisors under the Representative Agreement. Such commissions, he alleges, were contingent on his "credited" period of continuous service and that he received those commissions while working for AXA. ECF 15 ¶¶ 10, 22 (Preliminary Facts).

[12] Mooney does not expressly allege when AXA started paying him vested commissions. Ostensibly, his vested commission payments would have started in 2006. *See* ECF 15 ¶ 5 (Count IV) (alleging being credited eighteen years of continuous service at the time of his resignation in 2012—which suggests Mooney had twelve years of credited service in 2006). Even though this allegation is not expressly made, reading the complaint in the light most favorable to Mooney—which the Court must do in this procedural posture—the complaint implicitly alleges that AXA was paying him these commissions from 2006 to 2012 and that the commissions stopped once he left AXA's employment.

AXA argues that Mooney is not entitled to any commissions because he did not satisfy the contractual vesting requirements in the Associate Agreement. Namely, he does not have twelve years of continuous service—he falls three years short: he worked from 1994 to 2002 (8 years), had a year break, and then returned from 2003 to 2012 (9 years). According to the agreement, prior service only applies if it immediately precedes the entry into the agreement, ECF 15 Ex. 1 § IV.A, and thus, according to AXA, his prior service cannot be counted.

AXA also notes that the Associate Agreement has an Integration clause, which states that the written Agreement is the entire and final understanding of the parties and supersedes all prior agreements if any. The Agreement also states that it can only be modified by a writing approved by AXA Network. ECF 15 Ex. 1, § XX. Lastly, AXA notes that the terms of the Agreement are not ambiguous. Given these provisions, AXA asserts Mooney's basis for claiming breach of the Associate and Representative Agreements[13]—that there was some understanding to "credit" him with years of continuous service—is wholly dependent on inadmissible parol evidence that is contrary to the Integration Clause of the Associate Agreement and New York law.

In response, Mooney asserts that his claims are not based on inadmissible parol evidence. Instead, he argues that his claims are based on the doctrine of partial performance—namely, that the agreement to "credit" Mooney with years of continuous service was an oral modification of his Agreements that was at least partially performed. According to Mooney, because AXA agreed to credit him with several years of service and, based on that crediting, paid him commissions as if they had vested under the Agreements, Mooney is entitled to introduce extrinsic evidence to explain the oral modification to those Agreements. *See Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 341 (1977) ("Partial performance of an oral agreement to modify a

---

[13]  The Representative Agreement does not contain an Integration Clause. See ECF 15 Ex. 2.

written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing.").

### B.    Discussion

In the context of a written agreement, the parol evidence rule forbids proof of an oral agreement to add to or vary the writing where it is evident from the terms of the writing that the entire agreement between the parties was intended to be completely embodied in the document. *Fogelson v. Rackfay Const. Co.*, 300 N.Y. 334, 338 (1950).  Thus, when a written contract prohibits oral modifications, New York law precludes deviation from the written contract based on allegations of an oral modification where the only proof of the modification is the oral exchanges between the parties.  *Rose*, 42 N.Y. 2d at 343.  This common law principle has been codified by statute:

> A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

N.Y. Gen. Oblig. Law § 15-301(1).

The New York Court of Appeals, however, has recognized an exception to § 15-301(1), known as the doctrine of partial performance.  Under this doctrine, an oral agreement may modify a preexisting written agreement if (1) there has been partial performance of the oral modification and (2) that partial performance is unequivocally referable to the oral modification—that is, the conduct constituting the alleged partial performance must not be compatible with the written agreement.  *Rose*, 42 N.Y. 2d at 343-44.  In this scenario, a court may consider past oral exchanges and the conduct of the parties to explain the nature and extent of the  modification.  *Id.* at 343.  This doctrine applies even where the written agreement contains

a prohibition against oral modification.  *See id.* ("[A] contract once made can be unmade, and a contractual prohibition against oral modification may itself be waived.").

Here, Mooney has alleged facts that indicate that there was a modification to the Associate and Representative Agreements by pleading that AXA "credited" him with years of continuous service when he returned to work for the company in 2003.  He has also pled that AXA acted on this modification by paying him commissions and other compensation as if they had vested under the Agreements.  According to AXA, Mooney was never entitled to vested commissions because he had never accrued twelve years of continuous service, as required under the Agreements to trigger vested commissions.  Because Mooney has alleged that AXA paid him these commissions anyway, he has sufficiently pled that AXA acted in a way that was inconsistent with the written Agreements yet unequivocally referable to the alleged modification.  Accordingly, Mooney has sufficiently pled facts consistent with the partial performance doctrine.  His allegations therefore fall outside the prohibition of the parol evidence rule and N.Y. Gen. Oblig. Law § 15-301(1).

AXA's Memorandum in Support of its Motion to Dismiss relies heavily on the parol evidence rule and N.Y. Gen. Oblig. Law § 15-301.  It does not, however, address the exception provided by the partial performance doctrine.  In its Reply brief, AXA asserts that the partial performance doctrine is not available when the claimed performance is equally consistent with the agreement as written.  ECF 25 at 8 (citing *Gun Hill Rd. Serv. Station v. ExxonMobil Corp.*, Case No. 08-cv-7956, 2013 WL 395096, at *5-6 (S.D.N.Y.  Feb. 1, 2013).  In *Gun Hill*, the plaintiff alleged that the defendant engaged in conduct that was in partial performance of an oral agreement.  At summary judgment, the district court found these actions to be consistent with the written agreement, which foreclosed the application of the partial performance doctrine.

Although correctly stating the law, AXA's citation to *Gun Hill* does little because AXA fails to explain how its paying of vested commissions to Mooney is equally consistent with the Associate and Representative Agreements.

AXA's citation to *Volpe v. Interpublic Group*, 2013 N.Y. Misc. LEXIS 3431 (N.Y. Sup. Ct. 2013), is equally unavailing. AXA offers it for the proposition that arguments based on oral exchanges are barred because they are contrary to the plain language of an agreement. AXA does not, however, offer any discussion as to how this proposition defeats the allegations in the complaint under the partial performance doctrine.

Accordingly, Counts IV and V adequately state a claim for breach of contract.

## VI.    Breach of the Trademark Licensing Agreement

### A.    Contentions of the Parties

The Amended Complaint alleges that AXA Equitable Life Insurance and AXA Advisors breached the Trademark Licensing Agreement by failing to remit compensation to Mooney for use of the SARP mark. According to the Amended Complaint, AXA agreed to pay Mooney for use of his mark on an ongoing basis pursuant to a compensation structure that was not specified in the Agreement. ECF 15 ¶¶ 12-13 (Preliminary Facts).

AXA argues that the Agreement unambiguously states that Mooney has already received full compensation for use of the SARP mark. *See* ECF 15 Ex. 3 ¶ 2 ("Licensor acknowledges receipt of satisfactory compensation in consideration of and full payment for the License."). AXA also notes that the Agreement has an Integration Clause that forbids modifications except those in writing. ECF 15 Ex. 3 ¶ 7. AXA argues that, based on these provisions, Mooney has already received full compensation and any assertion that Mooney's consideration involves ongoing payments is contradicted by the plain language of the agreement. Again citing N.Y.

Gen. Obl. Law § 15-301(1), AXA further contends that any allegations made by Mooney about an ongoing compensation structure constitute inadmissible parol evidence.

Mooney responds by noting that parol evidence is appropriate in this context because the terms "consideration received" and "compensation" are not defined or described in the agreement. Because these terms are undefined, Mooney argues that he is entitled to introduce evidence to explain what the consideration was. He asserts extrinsic evidence explaining the nature of undisclosed consideration is not barred by New York law and does not violate the parol evidence rule.

## B.    Discussion

Mooney's trademark contract claim implicates another facet of the parol evidence rule. "[W]hile the parol evidence rule requires exclusion of evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written [agreement] which may tend to vary or contradict its terms, such proof is generally admissible to explain ambiguities therein." *67 Wall St. Co. v. Franklin Nat. Bank*, 37 N.Y. 2d 245, 249-50 (1975) (citations omitted). This is not an exception to the parol evidence rule; it is but a clarification of what the rule prohibits:

> Evidence to explain an ambiguity, establish a custom, or show the meaning of technical terms, and the like, is not regarded as an exception to the general rule, because it does not contradict or vary the written instrument, but simply places the court in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing. It is received where doubt arises upon the face of the instrument as to its meaning, not to enable the court to hear what the parties said, but to enable it to understand what they wrote as they understood it at the time.

*Murdock v. Gould*, 193 N.Y. 369, 375 (1908) (internal quotation marks and citation omitted); *see also Brewster v. Silence*, 8 N.Y. 207, 123 (1853) ("[P]arole evidence can not [sic] be received to contradict, vary or add to an instrument in writing, but only to explain it in case of ambiguity.").

Here, Mooney's allegations regarding his compensation structure under the Trademark Licensing Agreement do not constitute inadmissible parol evidence because they do not vary, add, or contradict the terms in the Agreement.  To the contrary, his allegations about his compensation merely help to explain the ambiguous terms "consideration received" and "compensation."  *See Ehrlich v. Am. Moninger Greenhouse Mfg. Corp.*, 26 N.Y.2d 255, 258 (1970) (noting that the recital of "value received" on a note did not prevent defendants from rebutting the recital because "recitation of receipt of consideration is a mere admission of fact which, like all such admissions, may be explained or disputed by parol evidence" (internal quotation marks and citation omitted)).

AXA offered little by way of contesting Mooney's allegations under the Trademark Licensing Agreement except to say that the terms of that Agreement are not ambiguous.  AXA, of course, offers no clarification as to what "consideration received" or "compensation" means. Although the terms of the Agreement clearly state that Mooney received *some* consideration, it is ambiguous as to what that consideration *was*.  This scenario is a quintessential example of when parol evidence should be taken.

At oral argument, AXA also argued that Mooney's allegations about his compensation structure were barred by the parol evidence rule because they were inconsistent with an unambiguous term in the Agreement—namely, Mooney's allegation of an ongoing payment plan is inconsistent with the term that states that consideration had already been delivered to Mooney. This argument fails.  The promise to make continued payments can constitute adequate consideration.  Thus, Mooney's alleged receipt of AXA's promise to make continued payments does not contradict the terms of the agreement.

Accordingly, Count VI states a claim for breach of contract under the Trademark Licensing Agreement.

## VII.   Defamation[14]

### A.     Contentions of the Parties

The Amended Complaint alleges that AXA employees made disparaging comments about Mooney to his clients and that such statements were defamatory per se.  ECF 15 ¶ 2 (Count III).  In a conversation with one of Mooney's clients, AXA employees stated that Mooney "only knew about life insurance," "didn't know anything about investments," "hated helping clients with investing their money," and "invested her in all of the wrong accounts because he didn't know what he was doing."  ECF 15 ¶ 4 (Count III).

AXA contends that the alleged remarks are not actionable for defamation because they do not constitute false statements, but rather mere opinions.  AXA argues that "not knowing" anything about investments and "hating" helping clients are the kinds of loose, figurative, non-actionable statements that are regarded as opinion in Ohio courts.  It also argues that the statements are cherry-picked from a lengthier conversation.  According to AXA, because purportedly defamatory remarks are evaluated in their larger context, the complaint is deficient for not alleging the entire conversation.  Finally, AXA contends that the statements are not actionable under the innocent construction rule and the doctrine of qualified privilege.

### B.     Discussion

Although all that is typically required to survive a motion to dismiss are allegations sufficient to raise a plausible inference that the plaintiff is entitled to relief, Ohio courts undertake a thorough analysis of defamation claims when considering the sufficiency of the

---

[14]  Count III is governed by Ohio law, by agreement of the parties.

pleadings.  *See, e.g.*, *Vail v. The Plain Dealer Publishing Co.*, 649 N.E. 2d 182, 184 (Ohio 1995).  Accordingly, the Court employs the same analysis as would any Ohio court.

Defamation is defined as a "false publication causing injury to a person's reputation, or exposing him to public hatred, contempt, ridicule, shame or disgrace, or affecting him adversely in his trade or business." *Sullivan v. Tucci*, 590 N.E. 2d 13, 14 (Ohio Ct. App. 1990).  In order to state a claim under Ohio law, Mooney must allege five elements: "(1) a false and defamatory statement, (2) about plaintiff, (3) published without privilege to a third party, (4) with fault of at least negligence on the part of the defendant, and (5) that was either defamatory *per se* or caused special harm to the plaintiff."  *Gosden v. Louis,* 687 N.E. 2d 481, 488 (Ohio Ct. App. 1996).

There are two kinds of defamation.  "Defamation *per se* occurs when material is defamatory on its face; defamation per quod occurs when material is defamatory through interpretation or innuendo."  *Id.*  "[I]n order to be found defamatory per se, the statement need[] only to *tend* to injure the plaintiff in his trade or occupation."  *Williams v. Gannett Satellite Info. Network, Inc.*, 834 N.E. 2d 397, 401 (Ohio Ct. App. 2005) (emphasis in original).  Words that are defamatory per se carry a presumption of falsity, damages, and malice, unless published with privilege. *Wampler v. Higgins*, 752 N.E. 2d 962, 977 n.8 (Ohio 2001).  Under Ohio's innocent construction rule, "if an utterance is reasonably susceptible of both a defamatory and an innocent meaning, as a matter of law, the innocent meaning is to be adopted."  *Sweitzer v. Outlet Commc'ns, Inc.*, 762 N.E. 2d 1084, 1091 (Ohio Ct. App. 1999).

A statement is not defamatory if it is a statement of opinion because "expressions of opinion are generally protected under Section 11, Article I of the Ohio Constitution . . . ."  *Vail*, 649 N.E. 2d at 184.  Whether an alleged defamatory statement is one of fact or opinion is a question of law that may be resolved on a motion to dismiss.  *Id.* (reversing dismissal of

defamation complaint for failure to state a claim); *see also SPX Corp. v. Doe,* 253 F. Supp. 2d 974, 978 (N.D. Ohio 2003) (explaining that because the privilege accorded opinions presents a legal question "it is appropriate to decide these issue in the context of a motion pursuant to Rule 12(b)(6)").

The primary issue in evaluating Mooney's defamation claim is whether the alleged remarks constitute statements of fact or opinion.[15]

A court must consider the totality of the circumstances when determining whether a defamatory statement is protected opinion. In answering this question, a court must consider four factors: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. *Scott v. News-Herald*, 496 N.E. 2d 699, 706 (Ohio 1986). "This analysis is not a bright-line test, but does establish parameters within which each statement or utterance may stand on its own merits rather than be subjected to a mechanistic standard. . . . Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." *Vail*, 649 N.E. 2d at 185.

First, the Court must determine the specific language used. When examining the particular words used in the contested statement, a court looks to "the common meaning ascribed to the words by an ordinary reader." *McKimm*, 729 N.E. 2d at 371. Moreover, the words are to "be read in the context of the whole . . . , rather than in isolation." *Rich v. Thompson Newspapers, Inc.*, 842 N.E. 2d 1081, 1087 (Ohio Ct. App. 2005). A reasonable reader is "less likely to infer facts from an indefinite or ambiguous statement than one with a commonly

---

[15]   At the outset, AXA's invocation of the innocent construction rule is unpersuasive. If the alleged statements are found to be factual and communicated outside a privilege, they unambiguously disparage Mooney and would tend to injure his trade or occupation. *See McKimm v. Ohio Elections Comm'n,* 729 N.E. 2d 364, 373 (Ohio 2000) (explaining that the "innocent-construction rule" only applies to statements that "are *reasonably* susceptible to an innocent construction" (emphasis in original)).

understood meaning." *Wampler*, 752 N.E. 2d at 978. Accordingly, the inquiry is "whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications." *Id*.

Here, the phrases "only knew about life insurance," "didn't know anything about investments," and "hated helping clients with investing their money" are not ambiguous or susceptible to many meanings. Although there is no direct statement that Mooney failed to perform his duties with regard to assisting his clients with their investments, this is the clear import of the specific language used. "Only knew" clearly implies that Mooney knew nothing about anything else. What was implied in that statement is made express in the next—"didn't know anything about investments." "Hated helping clients" also unambiguously indicates that Mooney was not interested in executing his duties to his clients. These statements embody a "pejorative implication" that a reasonable listener would perceive "as an assertion that the [plaintiff] failed to perform his duties as an advisor." *Mehta v. Ohio Univ.*, N.E. 2d 598, 609 (Ohio Ct. App. 2011); *see Scott*, 496 N.E. 2d at 707 (holding that though there was no express statement that the appellant had committed perjury, the clear impact of the specific language in nine sentences was that the appellant lied while under oath, which weighed in favor of an actionable statement).

The statement "invested her in all of the wrong accounts because he didn't know what he was doing" is even more indicative of an actionable statement. This is an express, unambiguous statement that Mooney invested the client's money incorrectly. Both implicitly and expressly, these statements convey a precise meaning—that Mooney was deficient in his job—and thus are likely to give rise to clear factual implications. The specific language factor therefore weighs in favor of regarding these statements as factual in nature.

Second, the Court must determine whether the statements are verifiable—that is, can they be objectively proven or disproven.  This analysis turns on whether "the author impl[ies] that he has first-hand knowledge that substantiates the opinion he asserts."  *Vail*, 649 N.E. 2d at 186.  If a speaker "represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of the opinion becomes as damaging as an assertion of fact."  *Scott*, 496 N.E. 2d at 707 (internal quotation marks and citation omitted).  But where a statement "lacks a plausible method of verification, a reasonable [listener] will not believe that the statement has specific factual content.  *Id.*

Here, although statements about what Mooney "knows" about investments or whether he liked or "hated" helping clients may or may not be susceptible to a plausible method of verification, whether Mooney invested his client's assets in "all of the wrong accounts" is plausibly verifiable.  AXA argues that what constitutes a "wrong" investment is a highly subjective statement that can vary from person to person.  The Court is unpersuaded by this argument.  In the realm of investing, where clients provide risk profiles and investment goals, determining whether someone invested assets consistent with those goals or whether they did not—regardless of the actual performance of the accounts—is well within the realm of plausible verification.  Or even more simply, the underlying goal of investment is to earn money.  If Mooney can show that the accounts in which he invested his client's funds turned a profit, this at least shows a minimum degree of success.   Even if the verifiability of the "wrongness" of Mooney's investment choices is not patently obvious and thus suggests some form of opinion, the speaker of this statement—being an AXA representative familiar with the client's accounts and Mooney's handling of them— implicitly represented that he had "first-hand knowledge

which substantiates the opinions he expresses." *Id.*  This is sufficient to conclude that the second factor weighs in Mooney's favor.

Third, the court must next determine the general context in which the statements appear. This factor requires examination of "the immediate context" of the allegedly defamatory remarks.  *Wampler*, 752 N.E. 2d at 980.  The language "surrounding the averred defamatory remarks may place the reasonable [listener] on notice that what is being [said] is the opinion of the [speaker]." *Id.*

Because Mooney has not pled the entire conversation between the AXA representatives and his client, the third factor affords very little guidance in the Court's inquiry.  That being said, the statements that Mooney did plead—though not necessarily all verifiable—do suggest a general context of disparagement.  Namely, the thrust of these statements appears to be that Mooney was bad at his job and that his client should allow AXA to repair the damage he had done.  Given that all reasonable inferences must be drawn in favor of the plaintiff on a motion to dismiss, this factor weighs, albeit slightly given the paucity of context, in favor of Mooney.

Finally, the Court must consider the broader context of the statements.  This factor examines whether, by custom or convention, the particular setting in which the statements occurred signals to the listener that what is being heard is likely to be opinion, not fact.  *Scott*, 496 N.E. 2d at 708.  For example, a letter to the editor in a newspaper or commentary from a newspaper columnist signals to a reader that the content is meant to be a persuasive statement of the writer's opinion.  *Rich*, 842 N.E. 2d at 1088.

This factor weighs in Mooney's favor.  Based on the allegations in the complaint, it appears that the statements took place in a private meeting between a potential client and AXA representatives.  In this type of professional setting, it is reasonable to infer that these AXA

representatives would not conduct this meeting without first reviewing the investments made by Mooney, the circumstances surrounding those investments, and the investment preferences of the client, so that they could most effectively pitch AXA's services to her.  This is not the type of context where a reasonable listener would expect to encounter loose, hyperbolic statements.  And even if a reasonable listener might expect to encounter statements phrased in the form of opinion, the listener would expect that these opinions would be supported by first-hand, factual knowledge.  Because the Court is required to draw all reasonable inferences in Mooney's favor, the fourth factor suggests that the broader context of the meeting is one in which a reasonable listener would expect to hear factual statements rather than opinions.

Accordingly, under the totality of the circumstances, the Court concludes that Mooney has sufficiently pled statements that are defamatory per se.

However, even if these statements are defamatory per se, they are not actionable if they were communicated under a qualified privilege.[16]  *DeAngelo v. W.T. Grant Co.*, 111 N.E. 2d 773, 776 (Ohio Ct. App. 1952).  The essential elements of a qualified privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only."  *Hahn v. Kotten*, 331 N.E. 2d 713, 719 (Ohio 1975).  If the communication is privileged, the plaintiff may not recover unless he demonstrates that the defendant made the statement with "actual malice, such as ill will, spite, grudge or some ulterior motive."  *DeAngelo*, 111 N.E. 2d at 776.

The Court need not examine whether the allegations in the complaint meet all the elements necessary to establish a qualified privilege.  Mooney has sufficiently pled that the statements were made with actual malice.  *See* ECF 15 ¶ 3 (Count III) (alleging that the President

---

[16]  Although qualified privilege is in the nature of an affirmative defense, on a motion to dismiss, Ohio courts look to see if the requirements of the privilege exist on the face of the complaint.  *See Bell v. Horton*, 669 N.E. 2d 546, 550 (Ohio Ct. App. 1995).

of AXA's American Division said that Mooney would "feel pain" for resigning and alleging that

AXA then took steps to discredit Mooney in the eyes of his clients).  A factual allegation

suggesting actual malice is all that is required at this stage to defeat an assertion of qualified

privilege.  Absent the elements of qualified privilege appearing on the face of the complaint,

"defendants may not establish the existence of an affirmative defense by a motion to dismiss

under Civ.R. 12(B)(6)." *Bell*, 669 N.E. 2d at 550.

Accordingly, the Amended Complaint states a claim for defamation per se.[17]

## VII.  Conclusion

For the foregoing reasons, Counts I and II fail to plead an antitrust violation.  Because (1)

the deficiencies in the Amended Complaint are nearly identical to those in the Original

Complaint; (2) the nature of the insurance industry precludes Plaintiff from plausibly asserting

any antitrust claim on his facts; and (3) Plaintiff has not requested leave to amend, the Court does

not believe that an additional opportunity to replead these counts would cure the deficiencies.

Counts I and II are therefore dismissed with prejudice.  Counts III – VI, however, state a claim

and will proceed.  Therefore, AXA's Motion to Dismiss the Amended Complaint will be

GRANTED IN PART, as to Counts I and II, and DENIED IN PART, as to Counts III – VI.

An appropriate order follows.

BY THE COURT:

MICHAEL M. BAYLSON, U.S.D.J.

O:\SDNY cases\13-3093 mooney v. axa\MTD Memorandum of Law 4.10.14.docx

---

[17]  In a letter to the Court, ECF 30, AXA directed the Court's attention to a recent case published in the Appellate Division of the New York Supreme Court. *See Frechtman v. Gutterman*, 979 N.Y.S.2d 58 (App. Div. 2014). Aside from the fact that Ohio law governs the disposition of this claim, the opinion in *Frechtman* does not add anything to the points of law already discussed.